United States Court of Appeals,

Eleventh Circuit.

No. 94-8666.

Jack R. ADAMS, as Parent and next of kin of Michael David Adams, deceased and Carolyn W. Adams, as Parent and next of kin of Michael David Adams, deceased, Plaintiffs-Appellees,

v.

Joyce H. POAG, Dr., Individually, Grant P. Carmichael, Dr., Terrence M. Martin, Physical Assistant, Individually, Marie Cody, RN, Individually, Defendants-Appellants,

Barbara Lewis, RN, Individually, et al., Defendants.

Aug. 28, 1995.

Appeal from the United States District Court for the Middle District of Georgia. (No. 90-252-3-MAC(DF), Duross Fitzpatrick, Chief Judge.

Before HATCHETT, Circuit Judge, CLARK, Senior Circuit Judge, and YOUNG[*], Senior District Judge.

HATCHETT, Circuit Judge:

Appellees, Jack and Carolyn Adams, parents of deceased inmate, Michael Adams, filed this 42 U.S.C. § 1983 action against appellants, members of a prison's medical staff, alleging that the appellants' medical treatment of their son constituted deliberate indifference to his serious asthma condition in violation of the Eighth Amendment. The district court denied the appellants' motions for summary judgment based on qualified immunity. We reverse.

FACTS

Because all issues in this case are so fact specific, we recite the facts in great detail. Michael Adams began serving a

[*]Honorable George C. Young, Senior U.S. District Judge for the Middle District of Florida, sitting by designation.

prison sentence in the Bostick (Georgia) Correctional Institution (Bostick) on September 15, 1989. Bostick and Rivers Correctional Institution (Rivers) are part of the Middle Georgia Correctional Complex (MGCC). Bostick does not contain an infirmary or infirmary beds; but, it does have a sick-call station. Rivers has an infirmary. Correctional Medical Systems, Inc. (CMS) provided professional medical services to MGCC pursuant to a contract with the Department of Corrections of the State of Georgia. The contract required CMS to provide a medical director to perform administrative duties at MGCC. CMS employed appellant, Dr. Grant Carmichael, as its medical director at MGCC during the relevant time period. Dr. Carmichael also provided clinical services at MGCC pursuant to an independent contractor agreement with CMS. Appellant, Dr. Joyce Poag, served as a part-time physician at Bostick pursuant to an independent contractor agreement with CMS. Appellants, Terrence Martin, a physician's assistant, and Marie Cody, a registered nurse, were employees of CMS assigned to MGCC. Upon his arrival at Bostick, Adams, a lifelong asthma sufferer, reported this condition to the nurse who conducted his initial medical screening examination. The examining nurse did not detect any asthma symptoms. Additionally, the inmate physical profile Bostick medical staff prepared noted that Adams suffered from chronic asthma and that he had recently been hospitalized for a severe asthma attack. Dr. Poag initialed the inmate profile.

On September 16, 1989, Adams twice complained of having an asthma attack. In response to Adams's first complaint, the duty nurse consulted Dr. Poag in a telephone conversation. Dr. Poag

ordered that Adams be administered an asthma treatment, Theophylline Elixir. Later that night, Adams complained to Nurse Cody of being unable to breathe. After consulting with Dr. Poag in a telephone conversation, Nurse Cody gave Adams Theophylline Elixir in compliance with Dr. Poag's orders. On September 17, 1989, at 2:30 a.m., Adams complained of an asthma attack to the duty nurse. The nurse noted that he was wheezing and had labored breathing with shortness of breath. Dr. Poag again, in a telephone conversation, ordered Adams be given Theophylline Elixir. Dr. Poag conducted her first personal examination of Adams on September 18. Dr. Poag noted wheezing and a rapid heart rate. She diagnosed acute asthma. Dr. Poag also noted that Adams's initial medical screening examination stated that he had been taking Theodur and Marax as asthma medications prior to his incarceration. Dr. Poag ordered Marax tablets, Theophylline Elixir, and ordered Adams transferred to the Rivers infirmary.

On September 18, Adams arrived at Rivers and remained in the infirmary through the following day. During his stay at Rivers, medical personnel did not notice any respiratory distress. Medical personnel checked his blood for Theophylline level. On September 19, Dr. Carmichael, without personally examining Adams, ordered discontinuation of Marax, and prescribed nebulizer treatments as a replacement. After receiving nebulizer treatments for two days at Rivers, Adams went back to Bostick.

On September 21, Adams complained to the duty nurse that he was "still having problems with asthma," and also requested Marax. Adams was not treated on this occasion though his chart was

referred to a physician. On September 22 at 6:10 a.m., Adams again complained of asthma problems and requested Marax. The duty nurse noted that Adams was wheezing, was rambling in conversation, and had a hostile attitude. He was not in acute distress. The duty nurse also scheduled Adams for a chest x-ray that morning; the chest x-ray showed no significant abnormality of the chest or lungs. The duty nurse then consulted with Dr. Poag, and no additional treatment was given. On September 25 at 12:25 a.m., Adams complained that he could feel an asthma attack coming on. The duty nurse did not note any wheezing and found his lungs were clear; therefore, he was not given any treatment. At 8 a.m. on September 25, Adams again complained that he was experiencing difficulty breathing. The duty nurse did not detect any acute distress; therefore, no treatment was given. The duty nurse did, however, schedule Adams for an appointment to see a physician on September 28, 1989. On September 28 at 1:15 a.m., Adams again went to the nurse's station at Bostick complaining of asthma. The duty nurse noted some mild symptoms of asthma and gave Adams Theophylline Elixir. At 2 p.m. that same day, Dr. Poag examined Adams and detected mild wheezing. She also noted that he suffered a slight asthma attack approximately once a week. Dr. Poag added Brethine to Adams's treatment plan and referred him to the medical clinic to determine if any allergy medications were needed. In her deposition, Dr. Poag testified that Brethine is a comparable medicine to Marax.

On September 29, 1989, at 10:30 p.m., Adams again went to the nurse's station at Bostick complaining of difficulty in breathing.

Nurse Cody saw him and noted no wheezing or cyanosis in his lips or fingernails. Nurse Cody noted that Adams was not in acute distress and did not provide him any additional medication because he had been administered his medications one hour earlier. On October 2, 1989, Adams again complained to the duty nurse that he could not breathe. The nurse noted slight wheezing and slightly labored breathing. The nurse did not detect cyanosis. On the order of Dr. Carmichael, Adams was given Theophylline Elixir and a nebulizer treatment. Adams's medical records state that he tolerated the nebulizer treatment well. At 7:30 that night, Adams again complained of an inability to breathe. The duty nurse did not detect any cyanosis, wheezing, or distress; however, Adams was given Theophylline Elixir.

On October 3 at 2:10 a.m., Adams again complained to Nurse Cody that he could not breathe. Nurse Cody listened to his lungs and noted that his lungs were clear, that he had good air return, and was not displaying any signs of distress. Adams was returned to his dormitory without medication. At 8 a.m. that day, Adams complained of being on the verge of a severe asthma attack. He complained of soreness of the throat and neck and of pain in the chest. He also stated that he was not responding to the medication that he was receiving. The nurse on duty did not note any acute distress and determined that no treatment was necessary. At 9:10 a.m., a physician's assistant examined Adams and noted wheezing in Adams's left lung; therefore, he administered an inhaler to Adams. When Adams began coughing and hyperventilating during the exam, the physician's assistant also ordered a Theophylline blood level

check. Upon receipt of the results of the blood check, the physician's assistant ordered an increase in Adams's medication and scheduled him for a follow-up medical examination one week later. On October 4 at 8:30 p.m., another physician's assistant saw Adams and noted that Adams was having acute bronchial spasms and wheezing. The physician's assistant ordered Adams be given two different asthma treatments, Theophylline and Decadron. On October 5, Adams complained of a sore throat and a runny nose and was administered Actifed on the orders of Dr. Poag.

On October 7 at 9:40 a.m., Adams again complained that his asthma was causing breathing problems. The duty nurse noted that his chest was tight and that he was experiencing wheezing in both lungs. The duty nurse also notified Physician Assistant Martin, who was at Rivers, of Adams's condition. Physician Assistant Martin ordered Adams transferred to the Rivers infirmary for nebulizer treatment. Martin examined Adams at the Rivers infirmary, and observed that Adams seemed to be moving adequate air. Adams received the nebulizer treatment, and his medical record states that he tolerated the treatment well. Adams was then returned to Bostick. At 5:50 p.m. that evening, Adams returned to the nurse's station at Bostick complaining of breathing problems. Adams was again taken to Rivers infirmary where his blood was drawn for a Theophylline level check, and he was given a nebulizer treatment. During the next four hours, Adams complained at least twice that the treatment he was receiving was not working. The nurses noted that he was in no acute distress. The nurse also stated in Adams's medical records that no more medications were to

be given until the results of his Theophylline level check results were known.  At 11:50 p.m., Adams requested to see a nurse.  When the nurse arrived, Adams again complained of an inability to breathe and the nurse told him that he could receive no further treatment until the results of his blood tests were known.

At 1:55 a.m. on October 8, Adams again complained of an inability to breathe.  The nurse noted that he was hyperventilating and that his skin tone was flushed although he was not sweating.  The nurse also telephoned Physician Assistant Martin, who was treating a patient at another MGCC facility, and notified him of Adams's condition.  Martin prescribed a nebulizer treatment and instructed the nurse to continue to observe Adams.  At 3:30 a.m., the duty nurse found Adams banging on the door of the Rivers Infirmary.  He was lying on the floor and complaining of an inability to breathe.  The nurse noted that he was sweating profusely, was suffering from a shortness of breathe, and labored breathing.  The nurse notified Physician Assistant Martin who drove to Rivers to examine Adams.  The last treatment note in Adams's file states that Adams continued to have breathing problems even with medical treatment and ordered Adams transferred to the outpatient clinic for further evaluation.  Physician's Assistant Martin made this entry and accompanied Adams to the hospital.  When Adams arrived at the outpatient clinic, he had no respiration or pulse.  He was declared dead of acute respiratory failure at 5:05 a.m. on October 8, 1989.

## PROCEDURAL HISTORY

On October 3, 1990, appellees, Jack and Carolyn Adams, as

parents and next of kin of Michael Adams, filed an action pursuant to 42 U.S.C. § 1983 in United States District Court for the Middle District of Georgia. [1]   On August 29, 1990, the district court referred the case to a magistrate judge for the conduct of proceedings in accordance with 28 U.S.C. § 636.  In June 1992, appellants moved for summary judgment asserting qualified immunity. On February 18, 1994, the magistrate judge recommended that the appellants' summary judgment motion be denied.  The magistrate judge concluded that genuine issues of material fact existed concerning whether the appellants' treatment of Adams amounted to deliberate indifference to his serious medical needs.  In May 1994, the district court adopted the magistrate judge's recommendation and denied appellants' motion for summary judgment.  Appellants filed a timely notice of appeal.

ISSUE

The sole issue raised on this appeal is whether the district court properly denied the appellants qualified immunity.

CONTENTIONS

The appellants contend they did not violate clearly established law because this court's prior case law establishes that treating an inmate's serious asthma in a manner similar to the treatment rendered to Adams, does not constitute deliberate indifference to an inmate's serious medical needs.  They also argue

---

[1]In addition to the appellants, the complaint named various officials of the Department of Corrections of the State of Georgia and members of the medical staff at MGCC.  Those other defendants were either voluntarily dismissed or were granted summary judgment.  Appellees do not appeal the grants of summary judgment.

that their actions in treating Adams did not violate contemporary standards of the medical profession. They buttress this assertion, pointing out that the parties to this action submitted conflicting medical expert testimony as to the appropriate method of treating Adams's condition. These conflicting affidavits, they argue, demonstrate the absence of a single prevailing standard in the medical community regarding the appropriate means of treating severe asthma. Therefore, their actions cannot be found to have constituted a violation of contemporary standards of the medical profession. Appellants also argue that if they are not entitled to qualified immunity, they are entitled to summary judgment on the merits because their actions did not amount to deliberate indifference to Adams's serious medical needs.

The appellees contend that the appellants were deliberately indifferent to Adams's serious medical needs because reasonable health care professionals in the appellants' positions would have recognized that Adams's course of treatment was inadequate and that Adams required stronger medication. Appellees further contend that the appellants' argument that they merely applied the wrong medication is meritless. They point out that when Adams arrived at Bostick, he notified the medical staff that he had suffered a severe asthma attack about a week earlier. He also told them that Marax effectively treated his condition. The appellants, however, substituted other medications and did not follow-up to determine if these medications or treatments were effective. Moreover, the appellants acted with deliberate indifference through their failure to use sound medical judgment to examine, diagnose, and treat

Adams.

DISCUSSION

We review the district court's ruling on a motion for summary judgment *de novo* and apply the same standards as those controlling the district court. *Canadyne-Georgia Corp. v. Continental Ins. Co.,* 999 F.2d 1547, 1554 (11th Cir.1993). Summary judgment is proper pursuant to Federal Rules of Civil Procedure 56(c) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Moreover, in deciding whether the district court erred, we review the evidence in a light most favorable to, and with all reasonable inferences drawn in favor of, the nonmoving party. *See Greason v. Kemp,* 891 F.2d 829, 831 (11th Cir.1990).

Qualified immunity insulates government actors, in their individual capacities, from civil lawsuits as long as the challenged discretionary conduct does not violate clearly established federal statutory or constitutional rights. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Lassiter v. Alabama A & M University Bd. of Trustees,* 28 F.3d 1146, 1149 (11th Cir.1994) (*en banc* ).[2] In order for the right to be clearly established such that qualified immunity will

---

[2] Although the appellants are not public employees in the strict sense of the term. Where a function that traditionally falls within the exclusive purview of a state entity is delegated to a private entity, state action is present. See *Ancata v. Prison Health Services, Inc.,* 769 F.2d 700 (11th Cir.1985).

not apply, the right must have been sufficiently established that "in light of preexisting law the unlawfulness [of the government actor's conduct] must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *Lassiter,* 28 F.3d at 1149. The objective legal reasonableness of the government actor's conduct is the touchstone of the inquiry into whether qualified immunity is applicable. *Lassiter,* 28 F.3d at 1150. A government actor can be stripped of qualified immunity only when all reasonable government actors in the defendant's place would know that the challenged discretionary conduct violates federal law. *Lassiter,* 28 F.3d at 1150. Consequently, qualified immunity protects "all [governmental actors] but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

In *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Supreme Court held that the Eighth Amendment proscription against cruel and unusual punishment prevents prison personnel from subjecting an inmate to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." 429 U.S. at 106. [3] The Court recognized the government's obligation to provide medical care for inmates: "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Estelle,* 429 U.S. at 103, 97 S.Ct. at 290. The state, therefore,

---

[3]The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." U.S. Const. amend. VIII.

has an obligation to provide adequate medical care to those whom it has incarcerated. *Estelle,* 429 U.S. at 103, 97 S.Ct. at 290. The Court cautioned, however, that not every allegation of inadequate medical treatment states a constitutional violation. *Estelle,* 429 U.S. at 105, 97 S.Ct. at 291-92. Mere negligence in diagnosing or treating a medical condition is an insufficient basis for grounding liability on a claim of medical mistreatment under the Eighth Amendment. *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292.

Our analysis of a claim of deliberate indifference to a prisoner's serious medical needs has two components: whether evidence of a serious medical need exists; if so, whether the defendants' response to that need amounted to deliberate indifference. *Mandel v. Doe,* 888 F.2d 783, 788 (11th Cir.1989). The appellants do not dispute the severity of Adams's medical needs. Moreover, our review of the record clearly demonstrates that Adams's asthma constituted a serious medical need. The parties disagree, however, over whether the medical treatment administered to Adams constituted deliberate indifference.

In order for appellants to be stripped of qualified immunity, the appellees must demonstrate that the appellants' actions in treating Adams's asthma violated a clear and specific standard and that similarly situated reasonable health care providers would have known that their actions violated Adams's constitutional right. *Howell v. Evans,* 922 F.2d 712, 719 (11th Cir.1991), *vacated,* 931 F.2d 711 (11th Cir.1991), *reinstated by unpublished order* (June 24, 1991), *cited in Howell v. Burden,* 12 F.3d 190, 191 n. * (11th Cir.1994). In a medical treatment case, a plaintiff may

demonstrate the existence of a clearly established medical standard either through reference to prior court decisions or to the contemporary standards and opinions of the medical profession. *Howell,* 922 F.2d at 719 (citations omitted). Plaintiffs frequently resort to the contemporary standards of the medical profession when the challenged action required the exercise of medical judgment. *Howell,* 922 F.2d at 719-20. In such an instance, a plaintiff may produce opinions of medical experts asserting that the inmate's treatment was so grossly contrary to accepted medical practices as to amount to deliberate indifference. *Howell,* 922 F.2d at 720. Although this inquiry may sound in medical malpractice, a plaintiff must demonstrate more than mere negligence in order to assert an Eighth Amendment violation. *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292. "[I]t is obduracy and wantonness, not inadvertence or error in good faith," that violates the Eighth Amendment in "supplying medical needs." *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986).

Our cases have consistently held that knowledge of the need for medical care and an intentional refusal to provide that care constitutes deliberate indifference. *Carswell v. Bay County,* 854 F.2d 454, 457 (11th Cir.1988); *Ancata v. Prison Health Services, Inc.,* 769 F.2d 700, 704 (11th Cir.1985). Medical treatment that is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness" constitutes deliberate indifference. *Rogers v. Evans,* 792 F.2d 1052, 1058 (11th Cir.1986). "A doctors's decision to take an easier and less efficacious course of treatment" also constitutes

deliberate indifferent. *Waldrop v. Evans,* 871 F.2d 1030, 1033 (11th Cir.1989). Additionally, when the need for medical treatment is obvious, medical care that is so cursory as to amount to no treatment at all may constitute deliberate indifference. *See Ancata,* 769 F.2d at 704. Also, delay in access to medical care that is "tantamount to "unnecessary and wanton infliction of pain,' " may constitute deliberate indifference to a prisoner's serious medical needs. *Brown v. Hughes,* 894 F.2d 1533, 1537 (11th Cir.) (per curiam) (quoting *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291), *cert. denied,* 496 U.S. 928, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990). Some delay in rendering medical treatment may be tolerable depending on the nature of the medical need and the reason for the delay. *Harris v. Coweta County,* 21 F.3d 388, 393-94 (11th Cir.1994). We must apply these standards in order to determine whether the appellants' actions violated Adams's clearly established constitutional right. *See Waldrop,* 871 F.2d at 1034 (evaluating challenged discretionary conduct individually because deliberate indifference inquiry is fact-specific).

*Dr. Carmichael*

Supervisory personnel such as Dr. Carmichael cannot be held liable under section 1983 for the actions of their subordinates under a theory of *respondeat superior.* *Monell v. Department of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); *Greason v. Kemp,* 891 F.2d 829, 836 (11th Cir.1990). The appellees may, however, impose liability on Dr. Carmichael if they can demonstrate that he either personally participated in the acts comprising the alleged constitutional violation or instigated

or adopted a policy that violated Adams's constitutional rights. *See Hill v. Dekalb Regional Youth Detention Center,* 40 F.3d 1176, 1192 (11th Cir.1994).

We apply a three-prong test to determine a supervisor's liability: (1) whether the supervisor's failure to adequately train and supervise subordinates constituted deliberate indifference to an inmate's medical needs: (2) whether a reasonable person in the supervisor's position would understand that the failure to train and supervise constituted deliberate indifference; and (3) whether the supervisor's conduct was causally related to the subordinate's constitutional violation. *Greason,* 891 F.2d at 837. The appellees assert that Dr. Carmichael, in his capacity as medical director of MGCC, failed to implement proper procedures that would have ensured that Adams received adequate medical treatment; that the absence of such procedures constituted deliberate indifference to Adam's medical needs; and that the lack of such procedures was causally related to Adams's death. They also argue that Dr. Carmichael personally treated Adams on at least two occasions and failed to adequately provide the necessary care and treatment. Specifically, the appellees argue that after Dr. Carmichael discontinued Dr. Poag's order for Marax and prescribed an alternative medication to treat Adams, he had an obligation to conduct a follow-up inquiry in order to determine whether the alternative medication was adequately treating Adams's condition.

In an affidavit accompanying his motion for summary judgment, Dr. Carmichael avers that the only actions he took with respect to

Adams's medical treatment were discontinuing Dr. Poag's request for Marax, and an October 2, 1989 consulting with a duty nurse regarding Adams's treatment. After discontinuing Marax, Dr. Carmichael ordered Adams treated with nebulizer treatments, as needed. In his affidavit, he characterizes Marax as "an outdated asthma medication which also contains a valium-type relaxant." Dr. Carmichael also avers that the narcotic-like effects of Marax make it unsuitable for use in the prison setting; therefore, it was not stocked in the prison pharmacy. Lastly, he asserts that final authority for determining which medications are stocked in the prison infirmary rests with the Department of Corrections of the State of Georgia. Dr. Carmichael's affidavit also asserts that the substitute medications Adams was receiving, Brethine, Alupent medication, and nebulizer treatments, were adequate substitutes for Marax.

The appellees submitted deposition testimony and an affidavit of Dr. Robert DiBenedetto, a pulmonary medicine specialist. Dr. DiBenedetto's opinion regarding the adequacy of the medical treatment that Adams received can be summed up by the following excerpt from his deposition:

> The way you treat a bad asthma attack and worsening asthma is in the hospital, intravenous corticosteroids; and that is the major treatment nowadays, and this fellow [Adams] had a very short course and actually worsening while on them because he was given oral steroids in inadequate doses when he should have been getting intravenous steroids.

The magistrate judge characterized the dispute in this case as concerning the appropriateness of the treatment that was given rather than whether certain treatment was given at all. The quoted passage from Dr. DiBenedetto's deposition demonstrates that the

magistrate judge properly perceived the issue in this case. We must, however, reverse the district court's denial of summary judgment as to Dr. Carmichael because, as *Estelle* teaches, the question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment "is a classic example of a matter for medical judgment" and therefore not an appropriate basis for grounding liability under the Eighth Amendment. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293. Dr. DiBenedetto's affidavit and deposition are helpful for what they do not say. Dr. DiBenedetto does not take issue with Dr. Carmichael's assertion that Brethine, Alupent medication, and nebulizer treatments are appropriate medications for treating severe asthma. Instead, he characterizes intravenous steroids as the "major treatment" for severe asthma. Thus, we may infer the existence of other asthma treatments whose efficacy matches intravenous steroids. Of course, this is precisely Dr. Carmichael's contention, and Dr. DiBenedetto's deposition concedes as much when he notes that Adams was "given oral steroids in inadequate doses." Implicit in this statement is the assertion that an "adequate" dosage of the medication Adams was receiving may have properly treated his condition. To the extent that Dr. DiBenedetto's expert testimony supports the appellees' assertion that Adams was administered inadequate doses of asthma medication, their claim sounds in medical negligence and is an inappropriate basis for attaching section 1983 liability. *See Estelle,* 429 U.S. at 107, 97 S.Ct. at 292-93.

Dr. Carmichael may also be liable to the appellees if he

personally implemented or adopted a policy that violated Adams's constitutional rights. We understand appellee's argument to be that it should have been apparent to Bostick's medical staff that the treatment Adams was receiving was ill-suited to the severity of his condition and that Dr. Carmichael, failed to institute a procedure that would have alerted the medical staff to that fact. In his affidavit, Dr. Carmichael states that "it is the practice and procedure of the medical departments at Bostick C.I. and Rivers C.I. to make notations in the medical files immediately following or as soon as possible after any evaluation, diagnosis, treatment, or review of an inmate's medical condition." The appellees have not alleged that this procedure evidences a deliberate indifference to Adams's or any other inmate's serious medical needs, nor have they asserted that this procedure contravenes contemporary standards of the medical profession. In fact, we may infer that the procedures described in Dr. Carmichael's affidavit would facilitate continuity in the medical care and treatment of MGCC inmates. Finally, the appellees do not contend that the medical staff at Bostick had a history of failing to recognize the progressively deteriorating conditions of its ill inmates such that Dr. Carmichael would be on notice that the procedures in place amounted to deliberate indifference to the inmate's serious medical needs. *See Anderson v. City of Atlanta,* 778 F.2d 678, 686 (11th Cir.1985) (finding supervisory liability on a claim of deliberate indifference to pre-trial detainee's serious medical needs where supervisor had received repeated complaints of inadequate staffing and failed to take action).

We hold that MGCC procedures for tracking the medical progress of inmates does not constitute deliberate indifference, nor did Dr. Carmichael's personal involvement in Adams's medical care constitute deliberate indifference. Accordingly, we reverse the district court's denial of qualified immunity as to Dr. Carmichael.

*Dr. Poag*

Dr. Poag served as a part-time physician at Bostick. Her treatment of Adams began on September 16 and 17, 1989. On both of those days, she received telephone calls from Bostick's duty nurse seeking advice on Adams's treatment. On both occasions, she prescribed Theophylline Elixir. Dr. Poag personally examined Adams on September 18, 1989, and as a result of that examination, prescribed Marax and ordered Adams transferred to the Rivers infirmary. Bostick's duty nurse also telephoned her on September 22, 1989, and following consultation, Dr. Poag decided that no additional treatment was needed at that time. Dr. Poag personally examined Adams on September 28, 1989. On that occasion, she added the medication Brethine to the course of treatment, and referred Adams to the medical clinic to determine if allergy medications were needed. In her deposition, Dr. Poag testified that Brethine is a comparable medicine to Marax. Dr. Poag's final involvement with Adam's treatment occurred on October 5, 1989, when the Bostick duty nurse called on the telephone and Dr. Poag ordered the nurse to administer medication to Adams.

In his deposition testimony, the appellees' expert, Dr. DiBenedetto, concedes that Dr. Poag's course of treating Adams "seemed to be adequate." He states, however, that the treatment

she rendered was inadequate because "there should have been some follow-up in three or four days when he [Adams] indeed was getting very bad." He also stated that Dr. Poag should have performed pulmonary function studies.

In *Howell v. Evans,* the widow of a prison inmate who died from severe asthma sought to impose section 1983 liability on one of the decedent's treating physicians. The plaintiff did not contend, however, that the treatment rendered by the physician was inappropriate at the time. Instead, the plaintiff asserted that as the decedent's condition worsened, a stronger course of treatment was required; that the physician should have known that the decedent's condition required close attention and could deteriorate at any moment; and, that the treating physician's failure to closely monitor the decedent constituted deliberate indifference. The court, however, rejected the plaintiff's claim on the grounds that none of the allegations satisfied the criteria for deliberate indifference. *Howell,* 922 F.2d at 721. At most, the appellees' allegation against Dr. Poag is that she did not diligently pursue alternative means of treating Adams's condition. In *Howell,* however, the court held that such an allegation did not "rise beyond negligence to the level of a refusal to treat as outlined by *Estelle.*" *Howell,* 922 F.2d at 721. As the court noted in *Howell:* "*Estelle* requires, however not merely the knowledge of a condition, but the knowledge of necessary treatment coupled with a refusal to treat properly or a delay in such treatment." *Howell,* 922 F.2d at 721. As was the case in *Howell,* we are unable to conclude that the appellees' allegations against Dr. Poag rise to the level of

deliberate indifference. Accordingly, we reverse the district court's denial of qualified immunity as to Dr. Poag.

*Physician Assistant Martin*

The appellees seek to impose liability on Physician Assistant Martin based on his treatment of Adams on October 7 and 8, 1989. Martin was at the Rivers infirmary on October 7 when the Bostick duty nurse notified him by telephone that Adams was experiencing difficulty. Martin ordered Adams transferred to Rivers where he administered nebulizer treatment. Martin also made an entry in Adams's medical record that Adams appeared to be responding well to the treatment. Adams subsequently returned to Bostick. However, at 5:55 p.m. he was returned to Rivers after complaining of difficulty breathing. At 1:55 a.m. on the morning of October 8, 1989, Martin received a telephone call from a nurse at Rivers, reporting that Adams was short of breath and was flushed. Martin, who was seeing a patient at another MGCC facility, ordered a second nebulizer treatment for Adams. Sometime after 1:55 a.m. that morning, Martin left the other MGCC facility and returned to Rivers to check on Adams. A nurse told him that Adams had responded well to the nebulizer treatment and had gone back to sleep. A few minutes after leaving, he received another telephone call concerning Adams. Martin returned to Rivers where he examined Adams and detected wheezing and sweating. He determined that Adams required treatment at an outpatient clinic. Martin also remained with Adams until the ambulance arrived. Unfortunately, Adams died while being transported to the outpatient clinic.

The appellees contend that Martin's failure to personally

examine Adams before prescribing the second nebulizer treatment and his failure to take further action when Adams's condition deteriorated on the day he died constituted deliberate indifference to Adams's medical needs.  We disagree.  The appellees stress the fact that Martin prescribed a nebulizer treatment for Adams over the telephone without personally examining him.  But, in *Howell,* this court held that prescribing similar medication over the telephone without personally examining the inmate did not constitute deliberate indifference.  922 F.2d at 721.  Moreover, we note that when Martin prescribed the medication over the telephone, he was unable to personally examine Adams at that time because he was tending to another patient elsewhere in MGCC.  Additionally, when Martin finished treating the other patient, he returned to River to check on Adams and at that time made the determination that Adams should be transferred to the outpatient clinic. Appellees argue that Martin was obliged to prescribe some stronger medication in order to treat Adams's obviously deteriorating condition.  Their expert, Dr. DiBenedetto, acknowledges that ordering Adams transferred to the hospital was the proper course of action.  Thus, Martin's liability turns on whether his failure to administer stronger medication to Adams pending the arrival of the ambulance constituted deliberate indifference.  Obviously, such a determination is a medical judgment and, therefore, an inappropriate basis for imposing liability under section 1983.  We note, moreover, that the outpatient clinic was located only one-half of a mile away from the Rivers infirmary.  Accordingly, we reverse the district court's denial of qualified immunity as to

Physician Assistant Martin.

*Nurse Cody*

Nurse Cody first examined Adams on September 16, 1989, when he complained of breathing difficulties.  Following a telephone consultation with Dr. Poag, she administered Theophylline elixir. Nurse Cody also treated Adams on September 29, 1989;  however, after examining him and failing to detect any respiratory distress, she did not provide him any medication or refer his condition to other medical personnel.  Nurse Cody asserts that she did not provide Adams any additional medication on that occasion because he had been given medication one hour earlier and she thought Adams should give the medication time to take effect.  Nurse Cody examined Adams again on October 3, 1989, did not detect any respiratory distress, found that he had good air return and, therefore, returned Adams to his dormitory without administering any medication or consulting with other medical personnel. Finally, on October 4, 1989, Nurse Cody administered Theophylline elixir on the orders of a physician assistant.

The appellees assert that Nurse Cody on a number of occasions denied Adams medical treatment or refused to allow him access to further treatment with other medical personnel.  Appellees specifically point to Nurse Cody's treatment of Adams on September 29 and October 3, 1989 as grossly inadequate.  They submitted the affidavit of Freddie S. Hepner, a registered nurse, stating that Nurse Cody's failure to alert a doctor on those two occasions to Adams's condition was grossly inadequate. We disagree.  Initially, we note that the appellees do not contend that Nurse Cody declined

to examine Adams on the two occasions in question. Moreover, on both occasions she apparently evaluated Adams's condition and made the medical determination that his condition did not require that she notify other medical personnel. The appellees do not point us to any case in existence prior to the events in question that would lead a reasonable nurse in Nurse Cody's position to conclude that her actions in treating Adams constituted deliberate indifference. Nor do they assert that contemporary standards of the medical profession required Nurse Cody to alert other medical personnel of Adams's condition after she had made the independent medical determination that such a course of action was not necessary. Appellees also do not assert that Nurse Cody's examinations of Adams were so cursory as to constitute deliberate indifference. In fact, Dr. DiBenedetto concedes that Adams was examined every time he visited sick call. Dr. DiBenedetto also concedes that he cannot assert that any of the examinations performed by the nurses at MGCC were below the standards of the medical profession.

Ultimately, the appellees allegations against Nurse Cody can be reduced to the assertion that she failed to recognize and treat Adams's progressively deteriorating condition. Our review of the record convinces us that the appellees cannot support the claim that Nurse Cody, or the other appellants, recklessly failed to detect Adams's admittedly deteriorating condition. This is a tragic case. The appellees, however, at most, have made out a colorable claim of medical malpractice. Therefore, we reverse the district court's denial of qualified immunity as to Nurse Cody.

CONCLUSION

Accordingly, the district court's order denying the appellants qualified immunity is reversed and the case is remanded for proceedings consistent with this opinion.

REVERSED and REMANDED.

CLARK, Senior Circuit Judge, dissenting:

Respectfully, I dissent. I believe the district court was correct in holding that there is a genuine issue of material fact as to whether the defendants were deliberately indifferent. The district court did not err in denying the defendants' motion for summary judgment.

Adams was convicted in Savannah for being a habitual DUI offender and was sentenced to one year in the Georgia prison system. While awaiting transfer to prison, Adams was hospitalized for a week with chronic asthma. When he reached the Bostick Correctional Institution on September 15, his admission sheet reflected that he suffered from chronic asthma and any work assignments should take that into account. Twenty-three days after admission, on October 8, 1989, he died as a consequence of not being properly treated for his asthma. The defendants/appellants were involved in the failure to treat his illness. During the twenty-three days he was seen twice by defendant Dr. Poag who recognized his symptoms of asthma. He was never seen by Dr. Carmichael, who was consulted by telephone by nurses and/or physician assistants. Dr. Carmichael discontinued the one medication which had aided Adams' asthma prior to his confinement.

Dr. Robert J. DiBenedetto, an internist and specialist in treating pulmonary ailments, testified by deposition. Dr.

DiBenedetto was Medical Director of the School of Respiratory Therapy at Armstrong and Medical Director of the Internal Medicine Residency Program at Memorial Medical Center in Savannah. He was furnished Adams' state prison medical records for review. Following are excerpts from Dr. DiBenedetto's deposition:

Q: Well, let me do what I don't want to do. You say you have a general feeling about the standard of medical care that was at this prison based on his records. Tell me what your opinion is generally.

A: The opinion is that this standard of care is inadequate.

Q: I take it that it's your opinion it doesn't meet community standards?

A: Absolutely not.

Q: Specifically what areas do you say are inadequate?

A: Well, first of all, let's take just as in general. People realize that there's an increasing mortality in asthma. We know it's in people who have been hospitalized before. We know it's in people who have repeated difficulties unresponsive to therapy, and we have an individual here who has been ill for almost a month, who is in and out of the infirmary; and that in and out is a red flag that says do something with this individual; hospitalize him. Put him on corticosteroids, which is the main form of therapy.

He had a seven-day course of corticosteroids, and during that time he got better for a day or two and then got worse. Somebody should have increased his steroids and kept him on them.

Secondly or thirdly there's a tremendous play on Theophylline in this chart which is now a third line drug. Many of the manipulations of the Theophylline as far as I was concerned was change one preparation for another when in reality the man needed to be, one, hospitalized, and, two, if they didn't want to hospitalize him, at least he should have been put on high doze (sic) corticosteroids for a protracted period of time.

And I could go on, but when nurses examine you and say patient hyperventilating, he had asthma. That's why he was breathing that way. We have comments in the chart that the patient is—they allude to him as some type of malingerer, and yet if you follow the course of what's going on, he's an asthmatic who was literally yelling out for help; and nobody

is listening to him.  Each day he has more and more trouble breathing.

We have gaps in the records where he was supposedly to be started on medicine.  A day, day and a half went by with no medicine.  To somebody with asthma, that's a disaster.

On the day of his demise, he was given an injection I believe of Vistaril, which is a sedative.  If you look in the literaure (sic), the asthmatics who die, they all die in hospitals basically, the bad ones who die, in the middle of the night when they're all usually—in the early days, in the 1950s and '60s—and I've seen some of this stuff in the medical literature—are given sedatives to shut them up, and we didn't know any better in those days.

But the last entry is he's gotten some Vistaril.  So I think the medicines were inadequate.  I think the people who took care of him were not aware of how sick you can get with asthma.  I think the nurses were cavalier.  I think the PAs were constantly juggling medicines, but they were juggling the same medicines, fooling with a little bit of change of doze (sic) or another brand, and many of the treatments were stopped gap.

There was an injection, a breathing treatment which are just—that's sort of like the first two steps leaving home plate on the way to first.  Then at that point he should have been treated totally different, and they didn't treat him that way.  When I look at this whole picture of a guy yelling out, please, help me.  He's showing up every day or almost every day into the dispensary and who is just getting an extra pill or an injection.  That's not the way you treat asthma.

The way you treat a bad asthma attack and worsening asthma is in the hospital, intravenous corticosteroids;  and that is the major treatment nowadays, and this fellow had a very short course and actually worsening while on them because he was given oral steroids in inadequate dozes (sic) when he should have been getting intravenous steroids.

So, you know, you asked me what specifically is bad about it, that's briefly what's bad about it.  The whole thing is bad.  It's just inadequate care.[1]

                *   *   *   *   *   *

Q:   Now, did you examine the specific liability of Dr. Carmichael, the medical director?

A:  Dr. Carmichael has these people working for him.  I think

---

[1]Deposition of Robert James DiBenedetto, M.D., at 19-23.

that he is not performing his job adequately.

Q:  In what regard?

A:  These doctors and nurses are incompetent.

Q:  Which doctors did you review records from are incompetent?

A:  It's very difficult to tell because a lot of notes in there are physician's calls, orders given, and it is exceedingly difficult to know who is doing what to whom.

There is one from Dr. Poag, I believe, P-O-A-G, whose therapy seemed to be adequate but—almost adequate in that she started him on corticosteroids, but there should have been some follow-up in three or four days when he indeed was getting very bad.  In addition, she should have had some pulmonary function studies on him, and you don't need a sophisticated laboratory to do that.

That can be done with simple hand-held devices that are very inexpensive which would allow you to identify a sick asthmatic who's in danger of getting into real trouble.  And those devices are well described in the literature and are in lots of general practitioners' offices.

Q:  What are they called?

A:  Spirometers.

Q:  Can you spell that for the court reporter?

A:  S-P-I-R-O-M-E-T-E-R-S;  and Peak Flow, P-E-A-K F-L-O-W, Meters, M-E-T-E-R-S.

Q:  Do you know whether these devices are commonly available in prison institutions?

A:  I don't know.

Q:  What did Dr. Poag do?  You said she was doing the proper studies, just didn't follow up right?

A:  I think that she should have—when presented with his asthmatic (sic), he had been hospitalized in the past, and he tells her that he can get really quite ill, and she examines him and finds him to be in an asthma attack, I think that some simple pulmonary function testing is in order.  And I think then at that point, the cost of therapy with what she did I think was initially adequate, starting him on Prednisone;  but I think a week's worth and the dozes (sic) that were used were inadequate.

And I can't tell you how bad he was at that time, but if

she's had some pulmonary function studies, I could tell you. And I go on the basis that she describes him as wheezing, but I'm not sure that it's severe wheezing or moderate wheezing; and asthmatics can fool you because they can die with no wheezing because they're not moving any air. So pulmonary function studies would have been very useful. They're simple to do. You don't need to be a specialist.

The second thing is maybe at that point, she should have considered putting him in the hospital for intensive intravenous therapy which would have avoided the whole incident because that's the standard of care.

Now, she chose to treat him medically orally, and I can't object to that because the doze (sic) of corticosteroids if she had used an adequate doze (sic)—and the only way she would have known what was adequate was to examine this fellow three days later, a couple days after that, and continually adjust his Prednisone until he had a good response because I believe from reading the record, my feeling is having taken care of many asthmatics that this patient probably should have been maintained the entire time on some oral Prednisone.

Q: Is the information that you have about treating asthmatics, is it generally held by medical practitioners?

A: Absolutely.[2]

*   *   *   *   *   *

Q: Why is that unusual, Doctor, to watch a patient with shortness of breath?

A: Because you treat him.

Q: Don't you monitor the patient?

A: Of course, you do, but you treat him.

Q: Is monitoring a patient a form of treating a patient?

A: No.

Q: It's not?

A: No; it's observation.

Q: What form of treatment should he have had?

A: At that point, he should have been transferred on 10/07. He should have been in the hospital on intravenous

---

[2]DiBenedetto deposition at 28-31.

corticosteroids, oxygen, and appropriate intravenous Aminophylline.

Q:  What date was that?

A:  10/07.

Q:  What time of day?

A:  9:15.

Q:  Was he, in fact, transferred to the hospital that evening?

A:  Yes.

Q:  All right.

A:  But what care did he get there?  What care did he get there?  They gave him some Elixophyllin, which is Theophylline which is—he was on plenty already, and that was inadequate; and then they sent him over there, and he winds up getting—if I can find the 10/07 sheet, we can talk about it.

But he comes over there, and they give him some more on 10/07.  They give him so (sic) more Theophylline.  That's not what he needs.  In fact, too much Theophylline can kill you.  And they're pumping him full of Theophylline.  I don't know what his level was, and I'm not even implicating that.  I'm just pointing out that it can be dangerous.

And they give him Brethine, which is a drug which is used for asthma which is basically an ancillary drug, and they gave him Actifed which is for people with allergies and has no effect at all on asthma.

Then they give him a breathing treatment, and they give him some Vistaril to sedate him, and then somebody says encourage fluid intake.  That's gone.  Nobody really pays much attention to that anymore.  And then they go transfer him, I guess, to Rivers at that point or it says admit to infirmary, so you'll have to tell me what the records are here, but 10/07 admission to infirmary.

And all that treatment, that's all just running around the busy.  There's no direct approach to this guy.  They should have had some pulmonary functions.  He should have been on intravenous therapy.  He should have been on intravenous corticosteroids.  He should have been on intravenous Aminophylline.  And what they're doing is, they're giving him a little of this and a little of that, and it's adding up to nothing.

*   *   *   *   *   *

A:   ....  That's where I'm coming from when I say—if you read all these notes, you come away with the feeling that people were just not paying attention to this man.[3]

The majority quite correctly notes that mere differences in medical judgment will not form the basis of a claim under the Eighth Amendment.  The excerpts from Dr. DiBenedetto's deposition quoted above, however, indicate significantly more than a difference in opinion in the proper treatment of severe asthma.  Dr. DiBenedetto's criticism of the treatment given to Adams is multi-faceted.  He asserts variously that Adams was not given sufficient doses of corticosteroids, that days went by when he received no medication whatsoever, that the changes in medication and dosage was haphazard, that he should have been put on intravenous corticosteroids, and that there was no follow-up after initial treatment proved ineffectual.

The majority's view of Dr. DiBenedetto's testimony suggests that there is a conflict in the evidence:

> Dr. DiBenedetto's affidavit and deposition are helpful for what they do not say.  Dr. DiBenedetto does not take issue with Dr. Carmichael's assertion that Brethine, Alupent medication, and nebulizer treatments are appropriate medications for treating severe asthma.  Instead, he characterizes intravenous steroids as the "major treatment" for severe asthma.  *"Thus, we may infer the existence of other asthma treatments whose efficacy matches intravenous steroids."*  Of course, this is precisely Dr. Carmichael's contention, and Dr. DiBenedetto's deposition concedes as much when he notes that Adams was "given oral steroids in inadequate doses."  *Implicit in this statement is the assertion that an "adequate" dosage of the medication Adams was receiving may have properly treated his condition.*[4]

In my view, these are questions best left to the trier of fact.

---

[3]DiBenedetto deposition at 33-37.

[4]Majority Opinion at 3244-45 (emphasis added).

Obviously, the course of treatment prescribed for Adams was ultimately insufficient. That which the majority "infers" and finds "implicit" are precisely the questions which should be put to the jury.

The Supreme Court last defined deliberate indifference in *Farmer v. Brennan,*[5] where the Court stated:

> With deliberate indifference lying somewhere between the poles of negligence at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated deliberate indifference with recklessness. See *e.g., LaMarca v. Turner,* 995 F.2d 1526, 1535 (CA11 1993).... It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.[6]

> \* \* \* \* \* \*

> Our decision that Eighth Amendment liability requires consciousness of a risk is thus based on the Constitution and our cases, not merely on a parsing of the phrase "deliberate indifference." And we do not reject petitioner's arguments for a thoroughly objective approach to deliberate indifference without recognizing that on the crucial point (whether a prison official must know of a risk, or whether it suffices that he should know) the term does not speak with certainty. Use of "deliberate," for example, arguably requires nothing more than an act (or omission) of indifference to a serious risk that is voluntary, not accidental. *Cf. Estelle,* 429 U.S., at 105, 97 S.Ct., at 291-292 (distinguishing "deliberate indifference" from "accident" or "inadverten[ce]"). And even if "deliberate" is better read as implying knowledge of a risk, the concept of constructive knowledge is familiar enough that the term "deliberate indifference" would not, of its own force, preclude a scheme that conclusively presumed awareness from a risk's obviousness.[7]

The majority seriously errs in holding that the medical treatment of Adams does not present a disputed issue of material fact as to whether or not there was deliberate indifference to

---

[5]--- U.S. ----, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

[6]*Id.,* --- U.S. at ----, 114 S.Ct. at 1978.

[7]*Id.,* --- U.S. at ----, 114 S.Ct. at 1980.

Adams' needs. The majority accepts the efficacy of the medical treatment notwithstanding Dr. DiBenedetto's opinion that what was done was largely wrong and that several known and available medicines and diagnostic techniques were not given or administered. Adams was seen only twice by a doctor during the twenty-three day period and a doctor was not called when he obviously was dying. Whether the indifference which is obvious in this case was reckless or accidental should have been determined by a jury, not by judges from a cold record.