[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-11220
Non-Argument Calendar
_____

D.C. Docket No. 4:14-cv-00460-CAS

CHARLES E. OWEN,

Plaintiff-Appellant,

versus

CORIZON HEALTH INC.,
Health Care Provider,
B. BOYD,
LPN,
T. KELLEY,
Nurse,
K. SANTIAGO,
Medical Doctor,
CORIZON LLC,

Defendants-Appellees.
_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(August 8, 2017)

Before MARCUS, MARTIN, and FAY, Circuit Judges.

PER CURIAM:

Charles Owen is a Florida prisoner proceeding pro se. This is his appeal of the district court's grant of summary judgment in favor of Corizon, LLC, Tammy Kelley, and Dr. Kalem Santiago.[1] Owen made claims under the Eighth Amendment against the defendants for their deliberate indifference to his serious medical needs. After careful review, we affirm the district court.[2]

## I.

Corizon LLC provided healthcare to inmates at Madison Correctional Institution ("the jail"). While Owen was incarcerated there, he sought medical care from Kelley and Dr. Santiago, both of whom worked for Corizon at the jail.

## A.

In 2013, before he arrived at the jail, Owen injured himself when he slipped at a different prison. As a result of that fall, he saw a healthcare provider at that prison and complained of back pain that radiated down his right leg. An x-ray showed he had degenerative disc disease but no fractures. The prison gave Owen a medical pass, which exempted him from lifting more than fifteen pounds, pushing, pulling, and squatting.

---

[1] The district court also awarded summary judgment to a fourth defendant, Billie Byrd. Owen does not challenge this ruling on appeal.

[2] The parties consented to jurisdiction by a U.S. magistrate judge. We refer to the magistrate judge's order as that of the district court.

2

In January 2014, Owen was transferred to the jail. Sometime after Owen arrived there, he realized his medical pass from the other prison was set to expire on April 8, 2014. On April 1, Owen visited sick call to have it renewed. Dr. Santiago renewed his pass that day. However, Owen says he did not receive the pass before his old one expired.

On April 10, Owen had yet to receive a renewed pass when he was ordered to help clean a room that had flooded. This involved lifting heavy items off the floor. Without a valid pass, Owen feared the consequences of refusing an order, so he began lifting. While lifting an object that weighed over 100 pounds, he heard his back snap and then nearly "blacked out" from the pain. He declared a medical emergency[3] and was taken in a wheelchair to the triage room.

At the triage room, Owen was seen by two different nurses—Kelley and Williams.[4] Owen says he saw Kelley first. She told him his pain was not an emergency and that she would send him back to his dorm. Owen tried to convince Kelley he needed emergency care, saying "I can[] hardly walk. That's not an emergency?" Kelley responded "you'll have to walk [] because this is not a wheelchair camp." Kelley then asked Owen his age. Frustrated, he responded,

_____

[3] According to the jail's Health Services Inmate Orientation Handbook, emergency health services are available 24 hours a day. When an inmate declares an emergency, the healthcare providers at the jail assess the inmate and determine whether he has a "true emergency." If a provider determines the inmate does not have a true emergency, the provider instructs the inmate that he can attend the next "sick-call."

[4] Williams's first name is not in the record.

3

"I'm 65, and for that reason if you neglect giving me medical care, it's a felony." Owen says his response provoked Kelley to shout "[y]ou're not going to threaten me. I'll have you locked up and I don't care." She then told him to leave the triage room and sit on a bench in the waiting area.

Ten minutes later, Williams assessed Owen. Williams recorded his symptoms, specifically noting that Owen experienced a sharp pain in his back as well as numbness and tingling in his right leg from lifting a box. Williams then gave him ten packs of Ibuprofen as well as an analgesic balm, but did not classify his visit as an emergency or refer him to a doctor.

## B.

On May 8, Owen was examined by Dr. Santiago. Owen complained of chronic back pain, for which Dr. Santiago ordered an x-ray and prescribed Ibuprofen. Owen also told Dr. Santiago that he would fall while walking and that he never received his renewed medical pass. Dr. Santiago got Owen the renewed pass and expanded its scope to require that Owen be given a lower bunk and to exempt him from having to stand for more than fifteen minutes.

The x-ray revealed that Owen had compression fractures and degenerative disc disease. When Dr. Santiago met with Owen to share the x-ray results, Owen told her that his lower back pain had gotten worse. Dr. Santiago prescribed him

4

more Ibuprofen and issued him an even broader medical pass to exempt him from all pushing, pulling, lifting, and sports.

A week later, Owen visited a nurse, complaining of back pain and sciatic nerve pain. Owen was limping and told the nurse he was experiencing pain radiating in both legs and numbness or tingling in his right leg. The following week, Owen saw Dr. Santiago again. In addition to the back pain, he complained that his right leg was numb and his feet were twitching. Dr. Santiago prescribed Sulindac, which is an anti-inflammatory drug, in place of Ibuprofen.

In September, Owen fell down a flight of stairs and was brought to the medical unit. Owen told a nurse he was having severe back pain and a new numbness is his legs. Dr. Santiago assessed Owen and prescribed him a walker and back brace.

More than two months after he fell, Owen submitted a "sick-call request" complaining that the pain medication was not working and that he had tremors in his left leg and "weakness or partial paralysis" in both legs. Owen saw a nurse, who noted his pain and that he walked bent over and with a limp.

On December 10, Owen visited Dr. Santiago, who ordered that Owen receive an MRI. The radiology report revealed a number of back injuries. It classified most of these injuries as mild or moderate, but found "moderate to severe right foraminal stenosis and impingement, right L4 nerve root."

5

### C.

In August 2014, Owen filed this suit pro se. After discovery, the defendants moved for summary judgment. The district court granted summary judgment for the defendants. Owen appealed that decision.

### II.

We review de novo a district court's grant of summary judgment, "taking all of the facts in the record and drawing all reasonable inferences in the light most favorable to the non-moving party." Peppers v. Cobb Cty., 835 F.3d 1289, 1295 (11th Cir. 2016). Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At bottom, we will grant summary judgment if no "reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).

### III.

Owen argues his Eighth Amendment claim—that the defendants were deliberately indifferent to his serious medical need—should survive summary judgment. Specifically, he says (1) Kelley should have treated his injury on April 10, 2014, as an emergency; (2) Dr. Santiago should have treated his leg symptoms

6

and not just his back pain, including by ordering an MRI sooner; and (3) Corizon's

policy on emergencies contributed to Kelley's violation.[5]

The Eighth Amendment prohibits "deliberate indifference to [the] serious

medical needs of prisoners" by prison healthcare providers.  Estelle v. Gamble, 429

U.S. 97, 104, 97 S. Ct. 285, 291 (1976).  The defendants admit that Owen had a

serious medical need, but argue that the record shows they did not act with

deliberate indifference to that need.  To prove that a prison healthcare provider

acted with deliberate indifference, a plaintiff must show the provider: (1) had

subjective knowledge of a risk of serious harm; (2) disregarded that risk; and (3)

acted with more than mere negligence.  Melton v. Abston, 841 F.3d 1207, 1223

(11th Cir. 2016) (per curiam).  A provider can act with deliberate indifference by

denying or delaying treatment.  Estelle, 429 U.S. at 104–05, 97 S. Ct. at 291.

For claims based on a delay in providing medical care, we consider "(1) the

seriousness of the medical need; (2) whether the delay worsened the medical

condition; and (3) the reason for the delay."  Goebert v. Lee Cty., 510 F.3d 1312,

1327 (11th Cir. 2007).  In addition, "[a]n inmate who complains that delay in

medical treatment rose to a constitutional violation must place verifying medical

---

[5] Owen also argues that Dr. Santiago should be held liable as a supervisor for failing to make sure Owen received his renewed medical pass before the old one expired.  We do not consider this claim because Owen failed to allege it in his amended complaint, and instead raised it for the first time in response to the defendants' summary judgment motion.  See Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) (per curiam) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").

evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1188 (11th Cir. 1994), overruled in part on other grounds by Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508 (2002).

## A.

Owen first argues that Kelley was deliberately indifferent because she failed to treat his injury on April 10, 2014, as an emergency. Kelley's actions do not meet the test for deliberate indifference, however.

We construe Owen's claim against Kelley to allege that she denied or delayed his medical care in violation of the Eighth Amendment. See Estelle, 429 U.S. at 104–05, 97 S. Ct. at 291. First, the record does not show that Owen was denied treatment for his injury. Owen provided evidence that he explained his injury to Kelley and that she determined the injury was not a medical emergency. Owen also submitted that during Kelley's assessment of his injury she became upset with him and sent him out of the triage room to the waiting room. However, Owen admits he waited only ten minutes before a nurse (Williams) resumed his examination. She took note of his symptoms and gave him pain medication and an analgesic balm. Therefore, the district court ruling that Owen received treatment and "was not ignored" is supported by the record.

8

Second, the record does not show that Kelley's failure to treat Owen caused a delay that made his injury worse. At most, Kelley's actions caused Owen to wait ten minutes before he was fully examined and treated. And Owen has presented no evidence that the ten-minute delay affected his injury. Without such evidence, Owen cannot succeed on his claim based on a delay in receiving medical care. See Hill, 40 F.3d at 1188. The district court did not therefore err in granting Kelley summary judgment on Owen's claim against her.

## B.

We next turn to Owen's claim against Dr. Santiago. He argues that Dr. Santiago ignored his complaints about his legs and treated only his back pain. Owen points to three pieces of evidence from the medical records to support this claim. First, Owen says the medical records from his visits to Dr. Santiago and other providers between May 8, 2014, and December 10, 2014, show that his legs were getting progressively weaker. He argues his complaints about his leg symptoms should have alerted Dr. Santiago that they required treatment. However, before eventually ordering the MRI on December 10, Dr. Santiago took no steps to treat or order tests to determine the cause of his leg symptoms. Second, Owen points out that his 2014 x-ray showed compression fractures in his spine that were not present in his 2013 x-ray. He argues that Dr. Santiago should have realized the compression fractures were a new injury and ordered further testing to

9

determine whether the fractures were impacting a nerve and causing the pain and numbness in his leg.  Third, Owen points to the MRI, which found a "moderate to severe right foraminal stenosis and impingement, right L4 nerve root."  Based on this finding, he contends the MRI confirmed he had nerve damage.  He argues the MRI shows that Dr. Santiago did not provide him with proper treatment because if she had ordered an MRI sooner, he could have received a correct diagnosis sooner.

These facts fail to raise a genuine dispute that Dr. Santiago was deliberately indifferent to Owen's medical needs.  Specifically, Owen has not shown that Dr. Santiago disregarded his leg injuries.  See Melton, 841 F.3d at 1223.  The record shows that in each of Owen's visits to Dr. Santiago, she assessed his injuries—including the symptoms involving his legs—and treated them.  During the eight months at issue, she ordered him an x-ray, changed his medication, issued him increasingly broader medical passes, prescribed him a walker and a back brace, and ordered him an MRI.  Owen disagrees with the course of treatment provided by Dr. Santiago, but that is not enough to survive summary judgment on an Eighth Amendment claim.  See Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991) ("[A] simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment [does not] support a claim of cruel and unusual punishment.").  In addition, Owen's allegation that Dr. Santiago should have ordered him an MRI at an earlier visit does not itself amount

10

to deliberate indifference.  "[T]he question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment."  Adams v. Poag, 61 F.3d 1537, 1545 (11th Cir. 1995) (quoting Estelle, 429 U.S. at 107, 97 S. Ct. at 293).  Finally, Owen failed to show that having an MRI sooner would have changed his treatment.  See Hill, 40 F.3d at 1188.  The district court did not err in granting summary judgment in favor of Dr. Santiago.

## C.

Owen's last claim is against Corizon.  Based on a sign in the triage room, Owen says Corizon's policy limited the definition of "emergency" to those that are "life threatening."[6]  Owen says this caused Kelley to deny him emergency care.  Even assuming Owen accurately describes Corizon's emergency policy, in order to hold Corizon liable based on its policy, Owen would have to show the policy led to the violation of his constitutional rights.  Craig v. Floyd Cty., 643 F.3d 1306, 1310 (11th Cir. 2011).  But as explained, Kelley's actions did not violate Owen's rights

---

[6] A sign posted on the triage room door said:

Emergencies

Life threatening (bleeding, impending loss of life or limb . . .) emergencies will be given immediate attention — self-declared emergencies will be assessed in triage area by medical staff.  If it is a true emergency that requires immediate attention, medical care will be given.

11

under the Eighth Amendment.  The district court was therefore correct to grant summary judgment in favor of Corizon.

**AFFIRMED.**