[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-15702
_____

D.C. Docket No. 1:11-cv-00513-KD-C

FRANK KRUSE,
as personal representative of Jacob Jordan, deceased,

Plaintiff-Appellant,

versus

JIMMIE L. WILLIAMS,
448 Howard Page Lane
Atmore, AL 36502,

Defendant-Appellee,

DALE BYRNE,

CARLA WASDIN,

KENNETH EARL MAY,
133 Lake Front Drive
Apartment 4001
Daphne, AL 36526,

CONNIE JOHANNA PIMPERL,
49500 Pimperl Road A
Bay Minette, AL 36507,

ROCKY LEE LANGHAM,
40550 Whithouse Fork Road
May Minette, AL 36507, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Southern District of Alabama
_____

(December 4, 2014)

Before HULL and MARCUS, Circuit Judges, and TOTENBERG,[*] District Judge.

PER CURIAM:

Frank Kruse, the personal representative of the estate of Jacob Jordan, appeals the summary judgment against his second amended complaint that Jimmie L. Williams, a nurse at the Baldwin County Corrections Center, was deliberately indifferent to Jordan's serious medical need in violation of the Fourteenth Amendment, see 42 U.S.C. § 1983, and committed medical malpractice that caused Jordan's wrongful death, in violation of state law. The district court ruled that Williams was entitled to qualified immunity from Kruse's federal § 1983 claim and declined to exercise supplemental jurisdiction over the state law claims. After review of the parties' briefs and the record, and with the benefit of oral argument, we affirm.

---

[*]Honorable Amy Totenberg, United States District Judge for the Northern District of Georgia, sitting by designation.

2

## I.  BACKGROUND

### A.    Jordan's Medical Condition and Detainment

Jordan was diagnosed with Addison's disease when he was approximately 17 years old.  Addison's disease causes a sufferer's adrenal glands to produce insufficient cortisol, which is a substance that helps the body regulate sodium and potassium levels, blood sugar, and blood pressure.

In 2010, Jordan was arrested and taken to the Mobile County Metro Jail for failing to comply with a condition of his release after pleading guilty to second degree possession of marijuana and two hunting offenses.  On June 25, 2010, Jordan became weak and nauseated and went to the jail's medical unit, where he received liquids throughout the evening.  The next day, Jordan reported feeling better and returned to his cell.  Later that day, the medical staff at Mobile County Metro drew a sample of Jordan's blood for testing.  The test results, which were returned to Mobile County Metro on July 2, 2010, revealed that Jordan had dangerously low levels of sodium and high levels of potassium.

On July 2, 2010, Jordan was transferred to the Baldwin County Corrections Center ("BCCC") without any medical records from Mobile County Metro.  The medical staff at BCCC did not learn of Jordan's critical test results until after his death.  However, Jordan's intake report, prepared on July 2, stated that he "TAKE[S] MEDS FOR ADDISON'S DISEASE" and "HAS ADDISON'S

DISEASE." On July 7, 2010, Jordan was evaluated by a nurse, who measured his blood pressure (79/48) and heart rate (88 bpm). Jordan told a nurse that he took Prednisone and Florinef for his Addison's disease, but the nurse could not verify his prescriptions at the pharmacies he listed. Jordan consented to release his medical records to BCCC on the same day.

Around 9:00 a.m. on July 8, 2010, nurse Connie Pimperl examined Jordan at his request. Pimperl wrote in Jordan's medical records that he had low blood pressure. Pimperl's note reflects that Jordan told Pimperl he was feeling weak, "like [he was] going to pass out," and that if his condition persisted, he would need to go to the hospital. Jordan stated that he did not "take meds on a reg[ular] basis as long as he [could] eat [and] drink when he needs to." Pimperl also recorded that Jordan's blood pressure was 90/51, his heart rate was 109 bpm, and his head was lolling from side to side. Although Jordan told Pimperl that he was dehydrated, Pimperl drew blood from Jordan easily, which she interpreted to be a sign that he was not severely dehydrated.

Pimperl then called the medical director of BCCC, Dr. Charles Sherman, who stated that no bloodwork was needed. Dr. Sherman instructed Pimperl to give Jordan some Gatorade "for sodium replacement" and to administer 40 milligrams of Prednisone for three days, and thereafter, doses of 20 milligrams and then eventually 10 milligrams daily. Around 9:30 a.m., Pimperl gave Jordan a 40-

4

milligram Prednisone pill as directed.  Jordan also drank four glasses of Gatorade and returned to his cell with a gallon of Gatorade.  At this time, Pimperl thought Jordan was in stable condition because his blood pressure had improved from the day before, his heart rate did not exceed 120 bpm, he "was not passing out in front of [her]", and he had not vomited.

At Pimperl's request, another nurse on the same shift contacted Jordan's mother to complete Jordan's medical history.  According to Jordan's mother, Jordan had not been to a doctor in about four years and managed his Addison's disease with diet and fluids.  The nurse recorded that Jordan had not taken his medication for a "long time"; had filled his prescriptions for Florinef and Prednisone at a local Winn Dixie store; and had been treated by two local physicians.

## B.    Williams's Conduct and Jordan's Death

Defendant Williams, a licensed practical nurse, arrived around 2:00 p.m. on July 8, 2010, to begin her shift at BCCC.  Jordan's medical records contain handwritten notes made by Williams at 4:00 p.m., 4:30 p.m., 6:30 p.m., 7:30 p.m., 8:00 p.m., and 9:45 p.m. on July 8.

At 4:00 p.m. (1600 hours), BCCC officers called a "code blue" to request medical assistance at Jordan's cell.  Williams responded to the request and discovered Jordan lying supine on the floor with his hand under his head and his

5

right leg elevated.  Jordan said that he was sick and had "passed out."  Jordan

asked to go to the hospital and told Williams, "[w]hen I was at Metro they sent me

to the hospital and gave me IV fluids" and "I feel worse now than then."  Jordan

also said that he had not taken his medication in two or three months.  Jordan's

skin was warm and dry, his blood pressure was 98/72, his heart rate was 85 bpm,

and his oxygen saturation was 100 percent.  Jordan had been told to drink Gatorade

and had drunk half of a Gatorade jug by 4:00 p.m.  Williams arranged for Jordan to

be moved from his cell block to the medical block and placed on general watch.

According to Williams's note at 4:30 p.m. (1630 hours), Williams was

informed that Jordan's mother had called the medical unit and told staff that

"[Jordan's] going to pass out!" and to "docket this also!"  Jordan saw his mother at

visitation earlier that day.  According to BCCC officers, Jordan "had ambulated

fine to visitation and back to [the] cell block," and Jordan's mother said during

visitation that Jordan "need[ed] to go to the hospital."

Around 6:30 p.m. (1830 hours), an officer in the medical block called

Williams and reported that Jordan was vomiting.  Williams noted that Jordan was

"[m]oaning and [said he] needed to go [to] the hospital!!"  At this time, Williams

called Dr. Sherman and Dr. Sherman verbally instructed Williams to give Jordan

25 milligrams of Phenergan (a sedative that alleviates nausea) and clear liquids

such as chicken broth.  Williams went to the medical block and found Jordan lying

6

on a mat on the floor. Williams administered the Phenergan to Jordan intramuscularly for his nausea and vomiting and gave him two cups of warm broth. Jordan continued to complain about having "never felt this bad" and being "dehydrated." Williams "[e]ncouraged [Jordan] to sip liquids only"; Jordan "[t]olerated [the injection of Phenergan] well"; and Jordan took a "[f]ew sips of broth." The note also states that "[e]ncouragement [was] given!" by Williams.

Williams's notes reflect that after 6:30 p.m., she twice made calls to the officers in the medical block to check on Jordan, and she personally went to the medical block to check on Jordan once during the night. Williams made the following entries at 7:30 p.m., 8:00 p.m., and 9:45 p.m.:

> 1930  Per officer inmate asleep. Chest rising and falling. No complaints.  J Williams LPN
>
> 2000  Per officer inmate lying on mat watching TV.  J Williams LPN
>
> 2145  Went to M [Block]. Inmate lying in floor on mat. Pulled blanket up and closed his eyes. Hopefully going back to sleep. No further complaints of [nausea and vomiting] voiced.  J Williams LPN[1]

At 1:30 a.m. on July 9, 2010, a coroner for Baldwin County pronounced Jordan dead. A state pathologist recorded Addison's disease as the cause of Jordan's death.

---

[1]In his affidavit, Walker states that "[n]o one came to check on Jordan after the broth was brought in." It is unclear whether Walker is saying nobody came into the cell or no officer even looked in the window to the cell. For purposes of summary judgment, it is undisputed that Williams did at least call the officers twice to check on Jordan. Williams does not maintain that she entered Jordan's cell when she went to the medical block to check on his status.

7

An investigation ensued.  The Alabama Bureau of Investigation ("Bureau")
prepared a summary of its findings to which it attached a statement given by Jemal
Demetrius Walker, Jordan's cellmate in the medical block.  In his 2010 statement,
Walker said "JORDAN came in the cell . . . about 4:45 P.M.", after which he
"vomited and WALKER helped JORDAN to the restroom on several occasions"
because "JORDAN was not able to move around or walk at all without being
helped."  "JORDAN told WALKER he was not going to make it[,]" but
"WALKER helped JORDAN to drink some of his chicken broth and Gatorade."
"[A]round 8:00 or 9:00 P.M.," a nurse "gave JORDAN a shot," and "JORDAN
told WALKER again he was not going to make it through the night."  "Around
11:00 P.M., WALKER helped JORDAN get situated on his mat on the floor then
WALKER got back in his bunk."  "A few minutes passed when JORDAN looked
up at WALKER, smiled, took two deep breaths, closed his eyes and bowed his
head."  "WALKER . . . touched [JORDAN] and could feel he was warm" and
"asked him if he was alright," but he "did not answer."  "After about five minutes
WALKER went back over to JORDAN and [discovered that he] was cold to the
touch, had no pulse and his lips were purple," at which time "WALKER then
notified corrections officers . . . ."

8

## C.    District Court Proceedings

Kruse was appointed as Jordan's representative and filed a second amended complaint on his behalf against Williams; Pimperl; Dr. Sherman; the Baldwin County Commission; Dale Byrne, the Warden of BCCC; and several BCCC employees (Carla Wasdin, Kenneth May, Rocky Lee Langham, Gregory E. Pinkard, Steve R. Drinkard, and Edward Scott).  The district court dismissed with prejudice the complaints against the Commission, Byrne, Langham, Pinkard, Drinkard, and Scott.  Later, Kruse dismissed his complaint against Wasdin.

Dr. Sherman moved to dismiss the complaint, and Williams, Pimperl, and May moved for summary judgment.  Kruse declined to file a response opposing Pimperl and May's motion.  The district court deemed abandoned Kruse's complaints against Pimperl and May and dismissed those two complaints with prejudice, and later dismissed without prejudice the complaint against Dr. Sherman.

Kruse filed a response to Williams's summary judgment motion and attached several exhibits, including an affidavit prepared by inmate Jemal Walker[2];

---

[2]Williams argued, to no avail, for the district court to disregard Walker's affidavit because it was produced after discovery closed.  The district court modified its scheduling order, see Fed. R. Civ. P. 16(b)(4), and reopened discovery for two weeks to allow Williams to depose Walker and to supplement her reply.  Williams declined to depose Walker or to supplement her pleadings.

9

the depositions of Jordan's mother Peggy Jordan, Dr. Sherman, and Williams; and materials prepared by Dr. Lester Silver and Sandra Tilton, two expert witnesses.

In his 2013 affidavit, Walker averred that Jordan "vomited a few times shortly after he" arrived in the medical block around 4:00 p.m. on July 8, 2010. At some point that evening, a nurse (presumably Williams) brought Jordan "some chicken broth and a tray of food." Although Jordan complained that "he was very sick and needed to go to the hospital," the nurse said that Jordan "could not go without a doctor's order and the doctor said he did not need to go." When Jordan asked again to go to the hospital, the nurse asked "what [he was] in [there] for." After Jordan said "for pot," the nurse replied, "well, if you hadn't used pot you could go to the hospital." According to Walker, after drinking some of the broth, Jordan vomited a couple of times.[3] There is no averment that Walker told anyone that Jordan had vomited after being given the shot and the broth. Specifically, there is no evidence that Williams knew Jordan had vomited after the Phenergan shot.

Walker, however, did help Jordan to the shower to get him clean, and Jordan kept telling Walker that Jordan was "going to die if they did not get him to the hospital." Walker also averred that "[n]o one came to check on Jordan after the broth was brought in." But the record shows that Williams called and checked in

---

[3]In his statement during the investigation, Walker did not state that Jordan vomited again after being given the shot.

10

with officers in the medical block at 7:30 p.m. and 8:00 p.m.  Williams was told by officers at 7:30 p.m. that Jordan was asleep and had no complaints, and at 8:00 p.m. that Jordan was lying on a mat watching television.

In her deposition, Peggy Jordan testified that, on the morning of July 8, 2010, Jordan called her and "could barely talk."  Later that day, Peggy went to visit Jordan at BCCC, where she observed that Jordan "could barely walk" with shackles on his hands and feet.  Jordan claimed to have vomited up a dose of Prednisone right after it was administered that morning.  As Peggy left BCCC, she told "the guards . . . behind the glass . . . [that Jordan] needed a wheelchair . . . [to] make it back to his cell."

When Peggy arrived home "[b]etween four and five," she "called the jail again to the medical unit."  In response to being told that her son had received a dose of Prednisone, Peggy said that Jordan had "thr[own] it back up" and that Prednisone "cannot be given on an empty stomach."  Peggy declared that "they needed to get [Jordan] to the hospital immediately or he was going to die," to which a nurse responded that "they couldn't send [Jordan] . . . to the hospital without a doctor's order" and she would "call the doctor."

Around 8:30 p.m., Peggy called BCCC again and spoke to a nurse, who told Peggy that Jordan had passed out on the walk back to his cell from visitation.  The nurse stated that Jordan had received "some Phenergan for the vomiting and a cup

11

of chicken broth . . . [that] the doctor ordered" and that Jordan "didn't need to go to the hospital." Peggy pleaded for "somebody . . . to get [Jordan] to the hospital because he [was] going to die" otherwise.

In his deposition, Dr. Sherman testified that a person having an "Addisonian crisis" constitutes a medical emergency that requires immediate treatment. Dr. Sherman knew that Jordan had Addison's disease and thought he was mildly dehydrated, but because Jordan's "blood pressure wasn't super low[, and] [h]e wasn't short of breath[,] . . . diaphoretic[,] . . . having severe abdominal pain, [or] pale," Dr. Sherman did not think Jordan was experiencing an Addisonian crisis at the time Williams called him around 6:30 p.m. During that phone call, Williams did not tell Dr. Sherman about Jordan's earlier episode at Mobile County Metro Jail, when he had received IV fluids at a hospital, or that Jordan reportedly "felt worse now than then." Williams told Dr. Sherman that Jordan's mother had visited and told someone at BCCC that Jordan was going to pass out and needed to go to the hospital. According to Dr. Sherman, Williams also stated that Jordan and his mother were "putting on" his symptoms, that Jordan "really wasn't ill," and "[Williams] didn't think there was anything to that."

In her deposition, Williams testified as to what occurred on July 8, 2010. When Williams responded to the "code blue" around 4:00 p.m., she found Jordan lying on the floor. This was the first time Williams had direct contact with Jordan.

12

Jordan told Williams he passed out and needed to go to the hospital.  Although the summary prepared by the Bureau stated that Jordan had "a headache . . . [and] could not see very well" at 4:00 p.m., Jordan did not report those symptoms to Williams.  After taking and recording Jordan's vital signs, Williams moved Jordan to the medical block "[s]o he could better be observed."  According to Williams, Jordan walked to the medical block without assistance, where he was placed on a mat on the floor in case he fainted again.

After examining Jordan around 4:00 p.m., Williams read Jordan's medical records, including the note written by Pimperl that morning stating that Jordan had low blood pressure and had told Pimperl he was "real weak."  Thus, Williams knew that Jordan had Addison's disease, was given Prednisone and Gatorade, was on the sick list the day before, was not taking his medication, and told Pimperl that he was dehydrated.  However, no one told Williams that Jordan had vomited at any time that afternoon before 6:30 p.m., and Williams never spoke to Peggy about her son.

Williams testified that she did not observe any signs between 4:00 p.m. and 6:30 p.m. to suggest that Jordan was having a medical emergency and needed to go to the hospital.  Williams next saw Jordan around 6:30 p.m., after a BCCC officer informed her that Jordan was vomiting.  Williams's "assessment of [Jordan] at the time that [she] saw him [was that] he did seem to be improving," and she did not

13

know what caused him to vomit.  Williams opined, based on her training and experience, that the morning dose of Prednisone given by Pimperl would have had time to take effect before Jordan vomited.  Williams called Dr. Sherman around 6:30 p.m. for further instructions and told him that Jordan had vomited.  Williams testified that she did not remember telling Dr. Sherman during this phone call that Jordan and his mother were "putting on" or faking his symptoms.

Williams never spoke to Jordan after giving him the Phenergan shot and chicken broth prescribed by Dr. Sherman.  Jordan never told Williams that he was not going to make it through the night, and none of the inmates repeated any comments to that effect to Williams or reported to any prison official that Jordan had vomited after 6:30 p.m.  Williams also testified that she could refer inmates to a hospital on her own, but she did not think Jordan was that ill:

> Q     Did you ever feel like you were under any kind of limitation in the number of inmates that you could refer either to an emergency room or to Dr. Sherman's office?
>
> A     No, sir, never.
>
> Q     If you felt like somebody was sick and needed to go see the doctor, would you make arrangements to have that done?
>
> A     Yes, sir.
>
> Q     And could you do that without calling Dr. Sherman, in other words, could you have a patient you've assessed and for whatever reason you think they need to be seen by a doctor, did you have the authority to send them on and get that done?

A    Yes, sir.

Q    The same thing for the emergency room, if you felt like a patient, an inmate, needed to go to the emergency room, did you have the authority to give that instruction and that be done?

A    Yes, sir.

Q    Had there been times in the past when you had referred patients to the emergency room or called an ambulance?

A    Yes, sir.
     May I add that we also let Dr. Sherman know if we do that.

Q    That's a good point.  But I just want to make sure we are clear, though.  You don't have to get his permission on the front end to issue that instruction, correct?

A    That's correct.

. . .

Q    And, again, just to be clear, if you had wanted to, you could have had him taken to the hospital at that point in time, couldn't you?

A    If I had deemed it necessary at that time.

Lester S. Silver, M.D., opined in his expert affidavit that Jordan's medical records and the officials' testimony revealed that Jordan "would probably have survived" had he been taken to the hospital on the evening of July 8, 2010, because the hospital would have administered IV fluids to quickly correct the electrolyte abnormalities that led to Jordan's death.

Sandra Tilton, a nursing expert, testified that Williams "did not follow the standards of care when she assessed Mr. Jordan."  Tilton testified that, had Jordan

15

"been monitored correctly and assessed for his condition before and after, with more vital signs and questions [to him], . . . [Williams] may have arranged to have him taken to the emergency room." Tilton also testified that Dr. Sherman could have decided to send Jordan to the hospital if Williams "had given him all the information that she received from [Jordan]" and that the common practice in prison medicine is "when in doubt, send them out."

On December 3, 2013, the district court entered summary judgment in favor of Williams, ruling that Williams was entitled to qualified immunity because she did not act with deliberate indifference to Jordan's serious medical need. Williams "obtain[ed] and implement[ed] a doctor's prescribed course of treatment"; she "was not deliberately indifferent simply by failing to heed the pleas of Jordan and his mother to send Jordan to the hospital" when that treatment was not prescribed by Dr. Sherman; and Williams's adherence to the treatment prescribed in the light of her monitoring of Jordan's symptoms did not "objectively constitute[] conduct exceeding gross negligence or . . . [suggest that she made] a choice to take an easier but less efficacious course of treatment."

The district court determined that the testimony from Kruse's expert witness, that Williams failed to adequately assess Jordan or defer to the "common ethos in prison medicine" to send a patient to a hospital, "place[d] Williams's actions on the level of negligence and [were] insufficient to support a claim of deliberate

16

indifference."  Likening the situation to that in Adams v. Poag, 61 F.3d 1537 (11th Cir. 1995), the "claim against Nurse Williams '[could] be reduced to the assertion that she failed to recognize and treat Jordan's progressively deteriorating condition,' and nothing in the record indicate[d] that this failure [rose] above 'a colorable claim of medical malpractice.' Id. at 1548." (alteration omitted).

Kruse timely appealed.

## II.  STANDARD OF REVIEW

We review de novo a summary judgment based on qualified immunity. Gilmore v. Hodges, 738 F.3d 266, 272 (11th Cir. 2013).  Summary judgment is appropriate when there exists no genuine factual dispute and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  To make that determination, we view the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant.  Gilmore, 738 F.3d at 272.

## III.  DISCUSSION

Kruse contends that Williams acted with deliberate indifference to Jordan's serious medical need, namely the complications arising from his Addison's disease.  Kruse argues that, in granting Williams summary judgment, the district court improperly made credibility choices and "ignored or misstated evidence that [was] favorable to" Jordan.  According to Kruse, Williams's statement to Jordan that "if you hadn't used pot you could go to the hospital" reveals an "attitude" of

17

deliberate indifference that strips her of her right to be immune from liability for Jordan's wrongful death.

## A.　Qualified Immunity

Under the doctrine of qualified immunity, a government official acting within her discretionary authority is immune from civil lawsuits unless her conduct violates a statutory or constitutional right that was clearly established at the time the alleged violation occurred. Id. "A government actor can be stripped of qualified immunity only when all reasonable government actors in the defendant's place would know that the challenged discretionary conduct violates federal law." Adams, 61 F.3d at 1543. The reasonableness of the defendant's actions are evaluated based on the law established in earlier court decisions and contemporary medical standards, Howell v. Evans, 922 F.2d 712, 719 (11th Cir. 1991), and in the light of "the information possessed by the official at the time the conduct occurred," Lancaster v. Monroe Cnty., Ala., 116 F.3d 1419, 1424 (11th Cir. 1997) (quotation omitted). Because "[t]he objective legal reasonableness of the government actor's conduct is the touchstone of the inquiry into whether qualified immunity is applicable," that doctrine insulates from liability "all but the plainly incompetent or those who knowingly violate the law." Adams, 61 F.3d at 1543 (alteration omitted).

**B.     Deliberate Indifference to Serious Medical Needs**

A prisoner's complaint about the failure to provide adequate medical care stems from his right to be free from cruel and unusual punishment under the Eighth Amendment.  See Estelle v. Gamble, 429 U.S. 97, 104-05, 97 S. Ct. 285, 290-91 (1976).  That right is violated when a prison official subjects an inmate to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  Id. at 106, 97 S. Ct. at 292.  Although the Fourteenth Amendment's Due Process Clause, not the Eighth Amendment, governs pretrial detainees like Jordan, identical standards govern claims brought under both constitutional provisions.  Goebert v. Lee Cnty., 510 F.3d 1312, 1326 (11th Cir. 2007).

To prove deliberate indifference, a plaintiff must first satisfy the objective component by showing that he had a serious medical need.  Id. at 1326.  Second, the plaintiff must satisfy the subjective component by showing that the prison official acted with deliberate indifference to his serious medical need.  Id.  The subjective component of the deliberate-indifference test requires the plaintiff to prove three things: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence."  Id. at 1326-27 (quotation and alteration omitted).  Whether an official has subjective knowledge of a risk of serious harm and whether she disregarded that risk are

19

questions of fact that can be demonstrated in the usual ways, including inference from circumstantial evidence.  Id. at 1327.  Third, the plaintiff must show that the official's wrongful conduct caused the constitutional harm.  Id.

As to the subjective component, a prison official acts with deliberate indifference if she "knows of and disregards an excessive risk to inmate health or safety."  Farmer v. Brennan, 511 U.S. 825, 837, 114 S. Ct. 1970, 1979 (1994).  The plaintiff must prove that the defendant "actually knew" of the risk—"[p]roof that the defendant should have perceived the risk, but did not, is insufficient." Campbell v. Sikes, 169 F.3d 1353, 1364 (11th Cir. 1999).  The official must act with "obduracy and wantonness, not inadvertence or error in good faith."  Adams, 61 F.3d at 1543 (quoting Whitley v. Albers, 475 U.S. 312, 319, 106 S. Ct. 1078, 1084 (1986)).  Additionally, an official who actually knew of a substantial risk to the inmate's health may be shielded from liability so long as she "responded reasonably to the risk, even if the harm ultimately was not averted."  Farmer, 511 U.S. at 844, 114 S. Ct. at 1982-83.

## C.     Williams Was Not Deliberately Indifferent

Williams "does not dispute that Jordan objectively had a serious medical need," so our inquiry focuses on the subjective component—whether Williams acted with deliberate indifference to Jordan's serious medical need in failing to send Jordan to a hospital on July 8, 2010.  We conclude that Kruse failed to

20

demonstrate a genuine issue of material fact as to the subjective component of the deliberate-indifference test.

Undisputed evidence establishes that Williams responded to Jordan's requests for medical care for his Addison's disease. See Adams, 61 F.3d at 1546 ("Estelle requires . . . knowledge of necessary treatment coupled with a refusal to treat properly or a delay in such treatment." (quotation omitted)).  Williams's first interaction with Jordan occurred around 4:00 p.m. on July 8, 2010, when she responded to the "code blue" request for medical assistance.  At that time, when Jordan complained that he had passed out, Williams assessed Jordan's vital signs, moved him to the medical block where "he could better be observed," and positioned him on the floor in the event he had another fainting episode.

Based on Jordan's ability to walk to the medical block unassisted, his consumption of Gatorade to replenish his electrolytes, and the lack of any other symptoms to suggest his condition was critical, Williams made the medical determination that Jordan did not require additional treatment at a hospital. Williams considered that Pimperl had given Jordan a dose of Prednisone several hours earlier, and that treatment apparently had improved his condition.  Even if we accept as true the testimony from Jordan's mother that Jordan vomited after receiving his morning dose of Prednisone, undisputed evidence establishes that this information was not communicated to Williams.

21

When Jordan vomited at 6:30 p.m. after being taken to the medical block, Williams provided more extensive medical treatment. Williams consulted with Dr. Sherman concerning Jordan's condition and informed Dr. Sherman that Jordan had vomited. Williams then implemented the course of treatment that Dr. Sherman recommended, which did not include sending Jordan to the hospital. Because Jordan was not exhibiting any signs of an Addisonian crisis requiring an emergency hospital visit, Dr. Sherman prescribed a dose of Phenergan and clear liquids. Williams thought that Jordan responded to that course of treatment; his medical notes reflect that he "[t]olerated [the medication] well" and took a "[f]ew sips of broth." There is no record evidence that Williams was told by Walker or anyone else that Jordan had vomited after 6:30 p.m.

Importantly too, undisputed evidence establishes that Williams checked on Jordan at least twice after giving him the chicken broth and Phenergan shot prescribed by Dr. Sherman. Jordan's medical notes indicate that officers in the medical block advised Williams about Jordan's condition at 7:30 p.m. and 8:00 p.m., and that Williams personally went to check on Jordan around 9:45 p.m., at which time Jordan appeared to be at rest and going to sleep. The record shows that Williams received no indication that Jordan's condition had deteriorated after she last assessed him around 6:30 p.m.

We are not persuaded by Kruse's arguments that Williams was deliberately indifferent in her treatment of Jordan. Kruse argues that Williams's remark to Jordan that "if he hadn't used pot [he] could go to the hospital" indicates that Williams "acted with an attitude of 'deliberate indifference,'" but we disagree. Williams's statement might be reasonably construed to mean that, had Jordan not been convicted of a marijuana offense, he would not be incarcerated and could go to the hospital at will. Kruse argues that Williams's statement could also be interpreted as meaning Williams was not going to send Jordan to the hospital simply because he had used marijuana in the past. In any event, even assuming the latter construction is reasonable, Williams's one verbal statement is not considered in isolation but must be viewed together with her objective conduct, which included checking Jordan's vital signs in response to the "code blue," getting Jordan moved over to the medical block so he could be better observed, calling Dr. Sherman to tell him that Jordan was vomiting, going to Jordan's cell and administering the medical treatment prescribed by Dr. Sherman, and calling officers in the medical block to check on Jordan at least twice in the four-hour period after administering the prescribed treatment. We conclude that, as a whole, Williams did not exhibit deliberate indifference to Jordan's serious medical need.

As the district court aptly pointed out, this is not a typical case of deliberate indifference. In most cases, the claim of deliberate indifference is against an

23

official who knows that an inmate is in serious need of medical care but fails or refuses to obtain any medical treatment for the inmate.  Farrow v. West, 320 F.3d 1235, 1246 (11th Cir. 2003) (quoting Lancaster, 116 F.3d at 1425).  But that is not this case—here, Williams did obtain medical treatment for Jordan by consulting with Dr. Sherman and administering his prescribed treatment of Phenergan and clear fluids.  This Court has also recognized that, even if medical care "is ultimately provided," an official can act with deliberate indifference by unreasonably delaying the treatment of serious medical needs, especially if the delay is for non-medical reasons.  Id.  But, as the district court noted, that is not this case either.  Kruse does not argue that the actual medical care that was provided to Jordan was unreasonably delayed.

Rather, Kruse's claim concerns the inadequacy of the type of medical care provided, rather than any delay in providing it.[4]  Although "courts hesitate to find an Eighth Amendment violation" when an inmate "has received medical care," this Court has cautioned that such hesitation "does not mean . . . that the course of . . . treatment of a prison inmate's medical . . . problems can never manifest" deliberate indifference.  Waldrop v. Evans, 871 F.2d 1030, 1035 (11th Cir. 1989).  Indeed, deliberate indifference may be established by showing that the medical care

---

[4]At oral argument, Kruse re-framed his claim as one entailing "no care" whatsoever after 6:30 p.m.  However, as noted infra, there is evidence that Williams at the very least conducted some periodic monitoring of Jordan's medical status.

received was so grossly inadequate to constitute—or at least create a material issue regarding—deliberate indifference.  See id.; Carswell v. Bay Cnty., 854 F.2d 454, 457 (11th Cir. 1988); see also Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991) (noting that medical treatment rises to the level of a constitutional violation only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness" (quotation omitted)).

And the deliberate indifference inquiry is particularly fact-intensive.  During the few hours that Jordan was under Williams's care on July 8, 2010, she promptly treated all of the symptoms of which she was made aware.  Given the short time frame of Williams's involvement in Jordan's care, her monitoring of Jordan for approximately six hours, her consulting with Dr. Sherman, and her administration of Phenergan and fluids, the record does not create a material factual issue as to deliberate indifference.  Moreover, the record indicates that Jordan did not appear to be rapidly deteriorating.  Although he had vomited, Dr. Sherman testified that he did not infer from Jordan's symptoms that Jordan was experiencing an Addisonian crisis.

Indeed, as the district court noted, even Kruse's experts' assessments of Williams's behavior do not rise beyond an accusation of malpractice.  Expert witness Sandra Tilton faulted Williams for failing to assess Jordan more thoroughly, but this alleged error does not amount to deliberate indifference.  See

25

Howell, 922 F.2d at 719 ("[T]he mere negligent diagnosis or treatment of a patient does not constitute deliberate indifference.").  As the district court also noted, this case is factually similar to Adams, in which a nurse examined a patient on several occasions, consulted with a doctor, and administered the doctor's prescribed treatment.  While the nurse's diagnoses and quality of care may have been subpar, as Williams's may have been, they did not rise beyond a "colorable claim of medical malpractice" to deliberate indifference.  See Adams, 61 F.3d at 1547.

Kruse relies on Farrow, but that case is materially different.  In Farrow, a prison dentist was aware that the plaintiff suffered from painful and bleeding gums and weight loss, prescribed dentures for him, but failed to deliver those dentures for fifteen months.  320 F.3d at 1244.  This Court emphasized that "this long delay in treatment" during which the plaintiff "was permitted to suffer [in] pain" raised a material question of fact regarding the dentist's deliberate indifference.  Id. at 1248.  Unlike the present case, Farrow involved a year-long period of withheld or delayed treatment, while Williams treated Jordan immediately but inadequately.  Lancaster, another case Kruse points to, is also inapposite because it involved the withholding of treatment altogether, not the provision of inadequate treatment.  Also, the defendants in Lancaster were not medical professionals, nor did they consult with any.  See 116 F.3d at 1426-28.  In sum, Kruse has failed to show that Williams's treatment of Jordan was constitutionally deficient.

26

Because Kruse has not shown that Williams violated Jordan's constitutional right to due process, we do not discuss whether that right was clearly established at the time of his death. Although Jordan's death is undoubtedly tragic, Williams is entitled to qualified immunity. Even if grossly negligent, Williams's failure to detect that Jordan's condition necessitated an emergency trip to the hospital is not sufficient to establish a claim of deliberate indifference in violation of the Fourteenth Amendment.

## IV.  CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of Williams.

**AFFIRMED.**