NOT FOR PUBLICATION

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 24-13692
Non-Argument Calendar
_____

CANYON DUFF MOYE,

Plaintiff-Appellee,

versus

FOUNTAIN CORRECTIONAL FACILITY, et al.,

Defendants,

MANUEL POUPARINA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama
D.C. Docket No. 1:22-cv-00026-JB-B

_____

Before JORDAN, JILL PRYOR, and KIDD, Circuit Judges.

PER CURIAM:

Canyon Moye, a former Alabama inmate housed at Fountain Correctional Institution, filed suit against prison officials, alleging that their deliberate indifference to his medical needs led to the partial amputation of his left foot. Moye's Eighth Amendment claim against Dr. Manuel Pouparinas,[1] the facility's medical director, proceeded to trial, and a jury found in Moye's favor. Dr. Pouparinas now appeals, challenging the denial of his renewed motion for a judgment as a matter of law. We conclude that sufficient evidence supports the jury's verdict, so we affirm the judgment below.

## I. BACKGROUND

### A. *Moye's Medical History and Incarceration*

In 2015, years prior to his incarceration, Moye was involved in a car accident, which left him with "sciatic nerve damage" and peripheral neuropathy. This caused him to have little feeling in his left leg and foot. The following year, Moye cut the bottom of his left foot while walking barefoot in a creek. Due to Moye's nerve damage, his wound never healed properly and the area around his left big toe became infected.

Eight months after the initial injury, Moye sought treatment from Dr. Grover Travis Paul. Dr. Paul conducted an MRI and bone scan, and he determined that Moye had a bone infection. At this first visit, Dr. Paul debrided and cleaned the area and took a culture of the wound to help identify any infections. While Dr. Paul

---

[1] Although the case caption lists the defendant's last name as "Pouparina," we will employ the spelling "Pouparinas" used by the parties in their briefs.

discussed amputation as a potential avenue to expedite recovery, Moye chose instead to take antibiotics. Moye was admitted to the hospital and administered antibiotics through a peripherally inserted central catheter, otherwise known as a PICC line. Moye's wound did "very well with" these intravenous ("IV") antibiotics and "healed up" by April 2017. Moye returned to Dr. Paul the following year with a new wound on the ball of his foot. After further IV antibiotics and wound cleaning, Moye indicated that his wound had "closed up" and he had "[n]o problems at all."

In August 2018, about a month after he finished his treatment with Dr. Paul, Moye was arrested and taken to the Escambia County Jail. During his year at the facility, the wound on his foot "busted back open" and began oozing, so he saw Dr. Jeffrey Dull, an outside podiatrist. In addition to ordering an MRI and x-ray, Dr. Dull took a culture of the wound so that he could determine if it was infected and, if so, prescribe the appropriate medication. Dr. Dull discussed with Moye the possibility of an amputation, but he did not anticipate having to take that route. Based on the results of the culture, Dr. Dull ordered Moye a PICC line IV treatment, which lasted for a total of six weeks and allowed the injury to "heal[] back up." When Moye returned a couple months later with a worsening wound, Dr. Dull took another culture and placed him on Cipro, an oral antibiotic. Moye indicated that when he last saw Dr. Dull in June 2019, his foot "was healed. Closed up."

In August 2019, Moye was transferred to Kilby Correctional Facility, "a processing . . . facility" for inmates upon their entering

into the Alabama prison system. Upon his arrival, Moye informed Kilby staff about his history with a bone infection during a medical intake assessment. And, at that time, his foot was in "[t]he same condition [as when he had last seen Dr. Dull]. Healed." However, during his month at Kilby, Moye was placed on "a mandatory job board" where he was made to wear "old uncomfortable state boots," which reaggravated his foot injury. Moye's wound "g[ot] a little worse every day," because he was not given any "padding" or support for his foot, and, on October 2, 2019, Kilby medical staff ordered him to avoid "prolong[ed] standing or walking."

Moye was next transferred to Fountain Correctional Institution. His medical records were also transferred from Kilby to Fountain. Upon his arrival on Friday, October 4, 2019, he placed a sick-call request stating: "I have an infected hole in my foot that is leaking green pus[] in my sock. This is the [second] time the same spot has busted back open. Please help." Dr. Pouparinas, Fountain's medical director and Moye's treating physician, was unable to schedule an appointment on that day because he was on prison grounds only Monday through Thursday. He was, however, always on-call from his home in Gulf Shores, Alabama, about an hour and a half away from the facility.

Prior to his appointment with Dr. Pouparinas the following Monday, Moye sent a picture of his foot to his parents using a contraband cell phone, because he "knew [he] was about to need help again" due to the state of his injury. At the appointment, Dr. Pouparinas cleaned and wrapped Moye's foot in addition to ordering

an x-ray and daily wound care. He also prescribed a medication regimen that included antibiotic creams and Augmentin, "a wide-spectrum antibiotic" taken by mouth. Dr. Pouparinas did not, however, take a culture of the wound or order an MRI. Although Dr. Pouparinas scheduled several follow up appointments and continued prescribing wound care and Augmentin, Moye's foot worsened and began leaking "more pus, getting more infected," and "turning different colors."

The turning point in Moye's treatment at Fountain occurred on November 15, 2019. On that Friday, Dr. Pouparinas was on call from his home when Moye came to the medical ward "with a green foot" that "just was[] [not] getting [any] better." A nurse practitioner took a culture of the wound and admitted him to the infirmary for administration of the IV antibiotic Zosyn. However, Dr. Pouparinas cancelled the IV antibiotic and discharged Moye from the infirmary with a prescription for Augmentin.

The results of the culture came back in late November 2019 and showed the presence of multiple infections in Moye's foot, the most dangerous being pseudomonas. The lab report also listed which medications would be effective at treating each infection, and, in early December, a nurse prescribed Moye Bactrim antibiotic pills. However, neither Augmentin nor Bactrim were listed on the culture report as being effective in treating pseudomonas. Yet Zosyn, the IV medication cancelled by Dr. Pouparinas, would have effectively treated this infection.

As Moye's condition continued to worsen, Dr. Pouparinas made a "routine" referral for him to receive outside treatment from Dr. Paul. In the weeks it took to schedule an appointment with Dr. Paul, Moye filed two more sick call requests, which included pleas to be placed on treatment lists and provided help "before . . . los[ing] a foot."

Moye finally saw Dr. Paul on January 7, 2020. At that point, Dr. Paul recommended an amputation, but he also debrided the wound, wrote a prescription for daily acetic acid, and ordered an MRI and a two-week follow up. Dr. Pouparinas followed Dr. Paul's instructions and temporarily admitted Moye to the infirmary for observation. However, it took several weeks to schedule the MRI. During that time, Moye asked a nurse whether he should be on antibiotics, and he showed her a "bluish-green colored drainage" leaking onto old gauze wrapping his foot. A new culture was taken, and Moye was prescribed additional medication, including Cipro, which was known to combat pseudomonas.

But the damage had already been done. When the MRI was completed on January 21, 2020, Moye had all five toes on his foot. However, due to a lack of bone visible on the image, the radiologist believed that Moye's toes had already been resected or amputated. Dr. Pouparinas left his position at Fountain later that month, and soon after, Moye underwent surgery to have all of the toes on his left foot amputated.

B. *Lawsuit and Jury Trial*

In January 2022, while still incarcerated, Moye filed a pro se lawsuit against Fountain, asserting that his partial foot amputation was due to the negligent medical care he received from prison staff. Following his release in August 2022, Moye retained counsel and amended his complaint in February 2023, naming (1) Dr. Pouparinas, (2) Wexford Health Sources, the contracted medical provider for the Alabama Department of Corrections, (3) Warden Mary Cooks, and (4) Warden Reosha Butler. As relevant here, Moye alleged, under 42 U.S.C. § 1983, that the medical treatment he received at Fountain constituted deliberate indifference and violated his rights under the Eighth Amendment.

Moye's Eighth Amendment claim against Dr. Pouparinas ultimately proceeded to trial. At trial, Moye presented expert and lay testimony from several witnesses. We will briefly summarize the testimony and trial evidence relevant to our analysis.

Moye presented two experts at trial: Dr. Dull, one of his treating physicians, and Dr. Nicholas Verdura, an independent expert. Both experts were highly critical of Dr. Pouparinas's treatment. Dr. Dull explained that, as a board-certified podiatrist, he had treated patients with pseudomonas and that Augmentin was not a drug associated with that infection. He stated that if a patient were receiving only Augmentin, "that[] probably [was] not the best course of therapeutic treatment," as the infection would continue to spread. He further noted that it was best to treat bone infections and pseudomonas quickly. Dr. Dull said that he would never

purposely "wait three or four months before . . . initiat[ing] proper treatment."

Dr. Verdura, "a board-certified general surgeon" with a specialty in wound care, testified that "there was definitely a lot to be desired from the management that was undertaken for . . . Moye's case." He thought that the care Dr. Pouparinas provided Moye "was not very good" and explained that, if Dr. Pouparinas realized he was in "over [his] head" with the treatment, he could have reached out to a specialist for consultation or sent Moye to the emergency room. Dr. Verdura explained that it is "imperative" to take a wound culture on a patient's first visit if there are signs of infection, and by not doing so, "you are effectively taking a blind dart throw by starting on an antibiotic in which you do[] [not] have a culture to help direct your therapy." Dr. Verdura observed that, when Moye first arrived at Fountain, he complained about green ooze from his sock, which was indicative of pseudomonas. He also explained that, although Dr. Pouparinas ordered an x-ray at that first visit, he never followed up on the result, which showed dislocated bones in Moye's foot. Dr. Verdura additionally noted that Dr. Pouparinas had reviewed Dr. Paul's records and was thus aware of Moye's previous treatments.

Dr. Verdura further opined that Moye's infection essentially went untreated for weeks and that IV antibiotics should have been immediately prescribed following the November 2019 culture. He explained that "Augmentin has zero effect against [p]seudomonas," so it was the "improper, incorrect antibiotic to be utilized," as there

was essentially no difference between treating pseudomonas with Augmentin and providing no treatment at all. Indeed, the primary medications Moye was prescribed while at Fountain—Augmentin and Bactrim—would have collectively been effective against only three out of the four infections identified by the culture. Dr. Verdura believed that it was a "terrible move" for Dr. Pouparinas to cancel the nurse practitioner's order for IV antibiotics, and he did not "have a reason for why that would have taken place." He further observed that, by the time Moye saw Dr. Paul in January 2020, "the damage ha[d] already been done and [Moye's] foot basically ha[d] been demineralized, meaning that the bones ha[d] been eaten up by the infection and [were] gone."

Dr. Verdura explained that Wexford's policies allowed additional forms of therapy that were not made available to Moye, including providing Moye (1) the ability to offload his foot, (2) therapeutic shoes, and (3) hyperbaric oxygen therapy. He further asserted that it was significantly cheaper for Dr. Pouparinas to order an x-ray and supply of Augmentin as compared to ordering an MRI and the administration of IV antibiotics, and he agreed that the degree of treatment afforded to a patient could be "controlled by cost." Ultimately, based on his review of Moye's records, Dr. Verdura concluded that Dr. Pouparinas acted with indifference through much of Moye's treatment.

Dr. Pouparinas testified to his decades of experience in the medical field. He explained that although he was a family practitioner, he "ha[d] provided wound care for a long time" and "do[es]

it all" with wound treatment. Throughout his testimony, Dr. Pouparinas emphasized that every action he took was what he believed was best for Moye's condition. He never prescribed medication that he thought was "useless" and prescribed acid washes on several occasions that were known to be effective in treating pseudomonas.

Dr. Pouparinas further stated that he did not believe that laboratory tests were necessary at Moye's first visit, because there was no swelling and Moye's vital signs and white blood cell numbers remained normal during his time at Fountain. Dr. Pouparinas also testified to and produced records showing that Moye missed several follow-up appointments, continued to walk on his injured foot, failed to attend ordered wound treatment, did not pick up medications, and refused treatments. Notably, there were days that Moye would pick up his prescriptions but fail to attend wound cleaning, despite the pill call window and infirmary being next door to each other.

He explained that inmates are made aware of their medical appointments and that information is provided to the guards and posted in the dormitories. Dr. Pouparinas recognized that there were times that inmates were restricted from leaving their dorms, and while he could not physically go get patients, he could request that guards immediately bring them to him or send an inmate to an outside emergency room "when . . . deem[ed] . . . clinically necessary." Dr. Pouparinas conceded, however, that he never made these requests for Moye. He also explained that he had a close

relationship with Dr. Paul and could call him with any treatment questions. He testified that he followed all of Dr. Paul's orders after Moye was referred to him for outside treatment.

With respect to the November 2019 IV treatment, Dr. Pouparinas agreed that those antibiotics were an important, necessary treatment for Moye's "serious medical need." In explaining why he cancelled Moye's IV and discharged him from the infirmary, Dr. Pouparinas pointed to an "R" notated in the computer-generated medical administration record indicating that Moye refused treatment, which Dr. Pouparinas had not identified when asked a similar question at a previous deposition. Dr. Pouparinas explained that, because he was not in the infirmary on that Friday, he discontinued the medication over the phone, and when he returned to Fountain the following Monday, he backdated and signed Moye's discharge documents but made no notation of the alleged refusal of treatment. He also admitted that the medical records did not include any elaboration as to why Moye refused treatment, and no other documentation discussed the refusal, including his notes from Moye's follow-up appointment.

Dr. Pouparinas conceded that if, hypothetically, Moye had not refused treatment and he, "on [his] own initiative, cancelled his treatment and sent him back into the population," this action would "constitute reckless indifference." He further admitted that it was odd that Moye allowed a hemlock device to be installed for easy administration of the IV antibiotics but then refused treatment, and that there were several inconsistencies between the

computer-generated medical records and handwritten appointment notes. Indeed, the record of Moye's November 2019 infirmary visit indicated that Dr. Pouparinas gave the discharge order prior to the time Moye purportedly refused treatment. However, Dr. Pouparinas attributed these clerical errors to a nurse.

Moye also testified. He maintained that he did not refuse treatment at any time while at Fountain. He explained that he "always wanted medical treatment," and he begged his parents to advocate for care on his behalf. Moye's father testified that he made over twenty verbal grievances to prison and state officials, even calling Alabama governor Kay Ivey's office. Moye testified that he tried to see Dr. Pouparinas every day, but many times, it was difficult for him to leave his dorm because it required an officer to open multiple grill gates to reach the infirmary. He explained that there were times he was omitted from sick call lists and, even if he was on the list, officers would not open the gates if there were lockdowns, "problems . . . down the hall," or they were "just . . . having a bad day," making it difficult for him to attend his appointments and pick up medications. As such, Moye would ordinarily see Dr. Pouparinas "once or twice a week." Moye stated that he tried to tell Dr. Pouparinas about his difficulties attending appointments, but Dr. Pouparinas never took any action to help him.

Moye also testified that his foot continued to get worse because of the shoes he was forced to wear, and he was not provided the ability to take weight off of his foot, given any IV medication, or permitted the option of going to an outside emergency room.

He felt like Dr. Pouparinas cared for him for "the first couple of days, but after that, not at all." Although Moye had discussed amputation with his previous doctors, he was never concerned about the procedure being necessary before his time at Fountain.

After Moye rested his case, Dr. Pouparinas moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a). The district judge denied the motion, concluding that although "[t]he burden [wa]s incredibly high on this constitutional claim, . . . there [wa]s evidence in the record before th[e] jury from which [it] could decide in either direction." Dr. Pouparinas then presented his case, which consisted solely of Dr. Paul's testimony. As relevant here, Dr. Paul explained that he did not prescribe Moye antibiotics in January 2020 because it was obvious that the wound was not going to heal, and he concluded that it was "almost best" to amputate because the "foot ha[d] been a problem for several years."

Once Dr. Pouparinas rested his case, he renewed his motion for judgment as a matter of law, which the district judge again denied. Following deliberations, the jury returned a verdict in favor of Moye, concluding that Dr. Pouparinas "was deliberately indifferent to [Moye's] necessary medical needs" and awarding Moye $400,000 in compensatory damages.

## C. *Post-Trial Proceedings*

In June 2024, Dr. Pouparinas filed a renewed motion for judgment as a matter of law under Rule 50(b), asserting that Moye's trial evidence failed to show that he acted with the requisite

subjective intent. While this motion was pending, we issued our decision in *Wade v. McDade*, 106 F.4th 1251 (11th Cir. 2024) (en banc), and Dr. Pouparinas notified the court of this legal development. As instructed by the court, each party filed briefs analyzing *Wade*'s impact on the instant case.

The district court then held a hearing on all pending motions in October 2024. Regarding his Rule 50(b) motion, Dr. Pouparinas asserted that the care Moye received at Fountain "did not rise to the level of deliberate indifference under *Wade*," as "he was never subjectively aware that his treatment . . . was meant to inflict punishment on . . . Moye," and it was undisputed that he provided Moye with consistent care while at Fountain. Dr. Pouparinas argued that Moye's care at Fountain was more than he "received prior to his incarceration."

In response, Moye asserted three points in favor of allowing the jury's verdict to stand: (1) Dr. Pouparinas had, up until that point, "always agreed with the law of the case"; (2) in any event, *Wade* was consistent with the law given to the jury, and (3) "the facts of th[e] case support[ed] a finding of reckless indifference" under *Wade*. As relevant here, Moye contended that "the conduct in this case was of arrogance, ignoring [of] a patient's needs, and, in essence, a complete lack of medical care," and that "[e]very non-medical-trained person in th[e] courtroom . . . would have provided better treatment than what Dr. Pouparina[s] provided." He further emphasized Dr. Pouparinas's concession at trial that, if the jury believed that Moye never refused treatment, his cancellation

of the IV medication in November 2019 would constitute "reckless indifference."

Following brief additional argument from Dr. Pouparinas, the district judge inquired as to *Wade*'s impact on the case, given that "th[e] case was tried to a jury" and "[j]ury instructions were given based on the law at the time." Dr. Pouparinas explained that *Wade* "d[id] not change the law" but rather clarified the correct standard, and, because the trial evidence demonstrated his belief that the treatment Moye received was clinically appropriate, the verdict could not stand. The district court disagreed and denied Dr. Pouparinas's motion. This appeal followed.

## II. STANDARD OF REVIEW

"We review *de novo* a grant or denial of a judgment as a matter of law" and "any questions of law raised by the motion." *MidlevelU, Inc. v. ACI Info. Grp.*, 989 F.3d 1205, 1214 (11th Cir. 2021). "In considering the sufficiency of the evidence that supports the jury's verdict, we review the evidence in the light most favorable to, and with all reasonable inferences drawn in favor of, the nonmoving party." *Id.* (quoting *Montgomery v. Noga*, 168 F.3d 1282, 1289 (11th Cir. 1999)).

"Judgment as a matter of law for a defendant is appropriate, when there is insufficient evidence to prove an element of the claim, which means that no jury reasonably could have reached a verdict for the plaintiff on that claim." *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1099 (11th Cir. 2020) (citation modified). We will "disturb the jury's verdict only when there is no material conflict

in the evidence, such that no reasonable person could agree to the verdict reached." *Bhogaita v. Alamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1285 (11th Cir. 2014). "In considering a Rule 50(b) motion after the jury verdict, only the sufficiency of the evidence matters. The jury's findings are irrelevant." *Ruckh*, 963 F.3d at 1099 (citation modified).

### III. DISCUSSION

Because our task is only to determine whether any reasonable jury could have returned a verdict in favor of Moye on his Eighth Amendment claim, Dr. Pouparinas faces an uphill battle.

"Deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain" prohibited by the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976) (citation modified). A successful deliberate indifference claim must satisfy both an objective and a subjective inquiry. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The parties do not dispute that the objective inquiry was satisfied. It requires a plaintiff to show "that he suffered a deprivation that was objectively, sufficiently serious." *Wade*, 106 F.4th at 1262 (citation modified).

The subjective inquiry is the point of contention in this case. At the time the jury returned its verdict, some cases within our Circuit employed the "more than gross negligence" standard, *see, e.g., Hoffer v. Sec'y Fla. Dep't of Corr.*, 973 F.3d 1263, 1270 (11th Cir. 2020), while others employed the "more than mere negligence" standard, *see, e.g., Keohane v. Fla. Dep't of Corr.*, 952 F.3d 1257, 1266 (11th Cir.

2020).[2] Sitting en banc, we clarified that a plaintiff instead must show that a defendant "acted with 'subjective recklessness as used in the criminal law,'" or, in other words, a defendant must be "actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff." *Wade*, 106 F.4th at 1262 (quoting *Farmer*, 511 U.S. at 839). However, a defendant "'cannot be found liable under the Cruel and Unusual Punishments Clause' if he 'responded reasonably to the risk.'" *Id.* (quoting *Farmer*, 511 U.S. at 844–45).

On appeal, the parties do not appear to dispute that Dr. Pouparinas knew of Moye's serious medical need. Rather, without conceding fault, Dr. Pouparinas argues that Moye's evidence, at best, showed that he committed medical malpractice rather than acted with deliberate indifference. He asserts that while Moye showed that other physicians would have provided different treatment, Moye failed to demonstrate that Dr. Pouparinas was "subjective[ly] aware[] that his course of treatment, chosen based upon his own clinical judgment, exposed Moye to a substantial risk of serious harm."

---

[2] Our pattern jury instructions recognize this split in our prior precedent, and to avoid confusion as to which standard applies, "suggests factors the jury can consider in determining whether a defendant was deliberately indifferent." Eleventh Circuit Pattern Jury Instructions (Civil Cases), Instruction 5.8, cmt. II (2024). The district judge followed the pattern instruction in this case, so we cannot say that the jury was persuaded by an incorrect standard in reaching its verdict. *See Ash v. Tyson Foods, Inc.*, 664 F.3d 883, 898 (11th Cir. 2011) (explaining that juries are presumed to follow the court's instructions).

Dr. Pouparinas argues that he provided "frequent, if not continuous, medical treatment," and no evidence suggested he prevented Moye from obtaining the prescribed care, refused to provide treatment, or failed to follow other doctors' recommendations. He contends that, although a jury could have concluded that his treatment "was not 'very good,' no reasonable jury could have determined that [he] failed to provide treatment or acted with deliberate indifference to Moye's medical condition," even though Moye ultimately required amputation. Dr. Pouparinas further asserts that allowing the jury's verdict to stand would "wholly undermine[]" the deliberate-indifference standard, and impermissibly allow Eighth Amendment claims to "become personal injury medical malpractice claims."

We recognize that a prisoner alleging deliberate indifference "has a steep hill to climb," *Keohane*, 952 F.3d at 1266, and that the Eighth Amendment does not require medical care "to be perfect, the best obtainable, or even very good," *Hoffer*, 973 F.3d at 1271 (citation modified). Likewise, in pre-*Wade* cases, we explained that Eighth Amendment claims cannot be sustained by showing "[o]rdinary malpractice or simple negligence," *Swain v. Junior*, 961 F.3d 1276, 1285 (11th Cir. 2020), and that "federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law," *Hoffer*, 973 F.3d at 1272 (citation modified).

But Moye prevailed at trial, so we must draw all reasonable inferences in favor of him. Doing so leads us to conclude that the

trial evidence permitted a reasonable jury to find that Dr. Pouparinas was deliberately indifferent to Moye's serious medical need. *See MidlevelU*, 989 F.3d at 1214.

Moye provided testimony from two expert witnesses critiquing the efficacy of Dr. Pouparinas's care, while Dr. Pouparinas provided no expert testimony to vouch for his course of treatment. Specifically, Moye's expert Dr. Verdura explained that it was imperative to take a culture immediately when a patient presents symptoms of infection, and Dr. Pouparinas failed to do so at his first appointment with Moye, missing key signs of the pseudomonas infection, including the green-blue hue of Moye's foot wound. The jury heard testimony that, without taking a culture of the likely infected injury, Dr. Pouparinas threw a "blind dart" and prescribed Augmentin, which had zero effect on the dangerous infection growing in Moye's foot. Indeed, Dr. Verdura explained that treating pseudomonas with Augmentin was the equivalent of providing no treatment whatsoever. *See Adams v. Poag*, 61 F.3d 1537, 1544 (11th Cir. 1995) (noting that, in certain circumstances, "medical care that is so cursory as to amount to no treatment at all may constitute deliberate indifference").

Dr. Pouparinas takes issue with Moye's reliance on Dr. Verdura's opinion as a wound care expert to establish that he, as a family medicine doctor, acted with deliberate indifference. We are unpersuaded by this argument, as Dr. Pouparinas frequently referenced his nearly 20 years of experience in the medical field and extensive knowledge of wound care. Indeed, Dr. Pouparinas testified

that he "d[id] it all" with respect to wound treatment. A jury thus could have reasonably accorded Dr. Pouparinas with the knowledge he claimed.

Despite this purported familiarity with wound care, the trial evidence suggested that Dr. Pouparinas failed to adapt his course of treatment to meet Moye's essential medical needs, even when it became clear that Moye's foot was not responding to the pre-scribed treatment. *See Wade*, 106 F.4th at 1267 (Rosenbaum, J., con-curring) (noting that "any competent doctor knows that the longer a serious infection festers, the more life- and limb- threatening it can become"). Instead, Dr. Pouparinas continued to prescribe inef-fective antibiotics, failed to timely request and review necessary la-boratory work and imaging, delayed referrals to outside doctors, and chose the most cost-effective treatment route. *See Adams*, 61 F.3d at 1544 ("'A doctor's decision to take an easier and less effi-cacious course of treatment' also constitutes deliberate indifferent [sic]." (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)). The jury heard testimony that these actions, or inactions, by Dr. Pouparinas essentially allowed Moye's infection to go un-treated for several weeks and fester, so by the time he was pre-scribed effective treatment, nothing else could be done except am-putation.

Notably, Moye presented evidence that Dr. Pouparinas dis-continued IV medication that would have effectively treated his pseudomonas infection in November 2019. We are mindful that there was conflicting evidence as to whether Moye willfully missed

and refused necessary treatment, including the IV antibiotics. But this is why we have juries. We have stressed that "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *MidlevelU*, 989 F.3d at 1214 (citation modified). As the trier of fact, the jury was free to credit Moye's version of events while disregarding Dr. Pouparinas's, given that Dr. Pouparinas was confronted with inconsistencies between infirmary records and discrepancies in his trial and deposition testimony. *Cf. United States v. Duldulao*, 87 F.4th 1239, 1265 (11th Cir. 2023). Further, Dr. Pouparinas specifically conceded during his testimony that, if he was incorrect that Moye refused IV antibiotics, his cancellation of this treatment would "constitute reckless indifference."

Based on this evidence, we conclude that a reasonable jury could find—as this jury did—that Dr. Pouparinas's actions, and inactions, constituted deliberate indifference. *Equal Emp. Opportunity Comm'n v. Exel, Inc.*, 884 F.3d 1326, 1329 (11th Cir. 2018) ("We will not second-guess the jury or substitute our judgment for its judgment if its verdict is supported by sufficient evidence." (quoting *Lambert v. Fulton Cnty.*, 253 F.3d 588, 594 (11th Cir. 2001)); *see also Ruckh*, 963 F.3d at 1099. As such, the district court did not err in denying Dr. Pouparinas's renewed motion for judgment as a matter of law.

## IV. CONCLUSION

We **AFFIRM** the district court's denial of Dr. Pouparinas's Rule 50(b) motion and the judgment below.